## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MIKE DEANGELIS, derivatively on behalf of BABCOCK & WILCOX ENTERPRISES, INC., | **C.A. No. _____** |
| Plaintiff, | |
| vs. | |
| E. JAMES FERLAND, JENNY L. APKER, DANIEL W. HOEHN, LESLIE KASS, THOMAS A. CHRISTOPHER, CYNTHIA S. DUBIN, BRIAN K. FERRAIOLI, STEPHEN G. HANKS, ANNE R. PRAMAGGIORE, and LARRY L. WEYERS, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| BABCOCK & WILCOX ENTERPRISES, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Mike DeAngelis ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Babcock & Wilcox Enterprises, Inc. ("B&W" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants E. James Ferland, Jenny L. Apker, Daniel W. Hoehn, Leslie Kass, Thomas A. Christopher, Cynthia S. Dubin, Brian K. Ferraioli, Stephen G. Hanks, Anne R. Pramaggiore, and Larry L. Weyers (collectively, the "Individual Defendants" and together with B&W, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of B&W, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 10(b),

14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding B&W, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by B&W's directors and officers starting on June 17, 2015 and through the present (the "Relevant Period").

2.      In 2015, the Company spun-off from BWX Technologies, Inc. ("BWX"),[1] and on July 1, 2015, B&W became an independent, publicly traded company (the "Spin-off"). B&W's common stock became registered on June 16, 2015 and was distributed on June 30, 2015 through a distribution to shareholders of BWX.

3.      B&W is a technology-based provider of advanced fossil and renewable power generation equipment and offers a broad suite of boiler products, environmental systems, and services for industrial and power uses. Additionally, the Company specializes in engineering and technology for power generation and other industries, the related procurement, erection and specialty manufacturing of equipment, and the provision of related services.

---

[1] Prior to the Spin-off, BWX Technologies, Inc. was known as The Babcock & Wilcox Company.

4.      The Company operates in three reportable segments: Power, Renewable, and Industrial. Through the Company's Renewable segment (the "Renewable Segment Business"), B&W supplies steam-generating systems and auxiliary and environmental equipment for the waste-to-energy and biomass power generation industries.

5.      From the beginning of the Relevant Period, the Individual Defendants promoted, or caused the Company to promote, B&W's Renewable segment as key to its future revenues and planned strategic shift away from its legacy fossil-fuel energy centered business.

6.      On June 17, 2015 B&W hosted its first Analyst/Investor day as a publicly traded company. Chief Executive Officer ("CEO"), President, and Director Defendant E. James Ferland and Senior Vice President and Chief Financial Officer ("CFO") Defendant Jenny L. Apker explained to those in attendance the rationale for the spin off and B&W's strategy going forward. Defendant Ferland stressed that the spin off was accomplished, in part, to diversify away from the Company's historical reliance on coal. As explained at the presentation, the percentage of U.S. electricity derived from coal was expected to decline significantly over the next decade.

7.      Based on industry-wide developments, the Company developed a three-pronged strategy: (1) cutting costs to improve margins (focusing primarily on Global Services, including Renewable aftermarket service contracts); (2) pursuing revenue growth opportunities in international markets in its Global Power division; and (3) pursuing strategic acquisitions.

8.      The Company's cost-cutting initiatives included outsourcing significant portions of its engineering and other duties for its international contracts to a joint venture in India. As Defendant Apker explained at the June 17, 2015 Analyst/Investor Day:

> An example of one of the engineering initiatives is that we have—with a couple of those international boiler projects that we recently won, we were able to bid the use of TBWES[2] engineers. In other words, our India joint venture engineers [sic]

---
[2] TWBES stands for Thermax Babcock & Wilcox Energy Solutions, a joint venture in India between Thermax

into the design engineering, thereby lowering the cost of the engineering for the bid and it made our bids more competitive.

9.     Defendant Ferland touted the Company's Global Power segment (which, at the time, included the Renewable segment), stating: "Global Power . . . is all about growth, it's about revenue growth, it's about expanding internationally, it's about expanding our product offering."

10.     Ferland continued, noting that B&W had "a ton of momentum" in Europe due to new waste-to-energy renewable projects. He added "we're leveraging our technology, we're delivering a finished product quite often to the customer, and we're partnering where we need to." Defendant Ferland explained that "our job in the renewable waste-to-energy business is to leverage the success we've had in the U.K., which is great, and that's good for at least 2 or 3 years for us, to find the next market."

11.     While making these positive representations to the market, the Individual Defendants failed to disclose, or caused the Company to fail to disclose, that the Company's resources had become stretched thin due to increased sales and cost--cutting initiatives, creating issues with several Renewable projects promoted to investors. According to certain confidential witnesses, the work done by Indian subcontractors was sub-par, and necessitated routine corrections by Company employees.

12.     Further, the Company was aware of critical design errors in a large project in Denmark (Copenhill). At Copenhill, issues with outsourced piping design necessitated a major redesign after work was more than half completed, resulting in the Company reallocating resources from other projects to remediate Copenhill.

13.     Despite making some incomplete disclosures between June 28, 2016 and July 2017, the truth did not fully emerge until August 9, 2017, when the Company issued its financial

_____

Limited, India, and Babcock and Wilcox Power Generation Group, Inc.

statements for the quarter ended June 30, 2017 in a press release disclosing the same, and August 10, when the Company held an earnings conference call with investors. These disclosures revealed, *inter alia*, productivity and scheduling issues in the Renewable Segment Business, increased costs to complete several contracts, a decision to invest in enhanced engineering and project management capabilities and infrastructure, and disappointing financial results.

14.     On this news, the price per share of B&W stock fell more than 72%, falling from a closing price of $9.75 on August 9, 2017 to close at $2.70 on August 10, 2017.

15.     During the Relevant Period, the Individual Defendants personally made and/or caused the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked

effective internal controls over financial reporting. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

16.     Due to the artificial inflation of the Company's stock price caused by the foregoing misrepresentations, for the repurchases of the Company's own stock during the Relevant Period, which repurchases were caused to be made by the Individual Defendants, the Company paid over $135 million more than the stock was worth.

17.     In light of the Individual Defendants' misconduct, which has subjected B&W -- as well as its Chairman and former CEO, and its Senior Vice President and CFO -- to being a defendant in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Western District of North Carolina (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, including through overpayment for stock through repurchases, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and of the Chairman-former CEO and of the Senior Vice President-CFO's liability in the Securities Class Action, their

being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims Plaintiff's claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder §14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and SEC Rule 14a-9 (17 C.F.R. §240.14a-9), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District because B&W is incorporated in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of B&W. Plaintiff has continuously held B&W common stock since he first purchased it during the beginning of the Relevant Period.

**Nominal Defendant B&W**

24.     B&W is a Delaware corporation with its principal executive offices at 13024 Ballantyne Corporate Place, Suite 700, Charlotte, North Carolina 28277. B&W's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "BW."

**Defendant Ferland**

25.     Defendant E. James Ferland ("Ferland") served as the Company's CEO and President from the time of the Spin-off until January 31, 2018, when he was replaced by Leslie C. Kass. He remains on the Board, where he has been Chairman since the spin-off, but is expected to step down on June 30, 2018. Prior to the Spin-off, he served as The Babcock & Wilcox Company's President and CEO since April 2012. According to the Company's Schedule 14A filed with the SEC on March 25, 2016 (the "2016 Proxy Statement"), as of March 11, 2016, Defendant Ferland beneficially owned 506,256 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2016 was $20.01, Ferland owned over $10.1 million worth of B&W stock.

26.     For the fiscal year ended December 31, 2016, Defendant Ferland received $5,685,319 in compensation from the Company. This included $978,500 in salary, $3,769,685 in stock awards, $758,464 in option awards, and $178,670 in all other compensation.

27.     The Company's Schedule 14A filed with the SEC on March 28, 2017 (the "2017 Proxy Statement") stated the following about Defendant Ferland:

> E. James Ferland serves as our Chairman and Chief Executive Officer. Prior to the spin-off, Mr. Ferland was BWC's President and Chief Executive Officer since April 2012. Prior to joining BWC, Mr. Ferland served as President of the Americas division for Westinghouse Electric Company, LLC, a nuclear energy company and group company of Toshiba Corporation, from 2010 through March 2012. From 2007 to 2010, Mr. Ferland worked for PNM Resources, Inc., a holding company of utilities providing electricity and energy products and services, where he held positions as Senior Vice President of Utility Operations and Senior Vice President of Energy Resources. Previously, Mr. Ferland held

various senior management and engineering positions at Westinghouse Electric Company, Louisiana Energy Services/URENCO, Duke Engineering and Services, Carolina Power & Light and General Dynamics. Mr. Ferland has also served on the board of directors of Actuant Corporation since August 2014.

Mr. Ferland is an experienced executive with a utility leadership background that includes both regulated and merchant operations. He has led organizations that generate power (coal, nuclear, gas, renewables), transmit power and trade power. He also has extensive supplier leadership experience in commercial nuclear power, manufacturing, engineering and field services. With more than 25 years of senior management and engineering experience in diversified industries, he brings valuable perspectives to all industries in which we operate.

**Defendant Apker**

28.     Defendant Jenny L. Apker ("Apker") has served as the Company's Senior Vice President and CFO since the Spin-off. Prior to the Spin-off, Apker served as The Babcock & Wilcox Company's Vice President, Treasurer and Investor Relations since August 2012. According to the 2016 Proxy Statement, as of March 11, 2016, Defendant Apker beneficially owned 36,237 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2016 was $20.01, Apker owned over $725,102 worth of B&W stock.

29.     For the fiscal year ended December 31, 2016, Defendant Apker received $1,130,750 in compensation from the Company. This included $420,000 in salary, $538,498 in stock awards, $108,357 in option awards, and $63,895 in all other compensation.

30.     The Company's 2017 Proxy Statement stated the following about Defendant Apker:

> **Jenny L. Apker**,[3] age 59, serves as our Senior Vice President and Chief Financial Officer. Prior to the spin-off, Ms. Apker served as BWC's Vice President, Treasurer and Investor Relations since August 2012 and, prior to that time, served as BWC's Vice President and Treasurer since joining BWC in June 2010. Previously, Ms. Apker served as Vice President and Treasurer with Dex One

---

[3] Throughout this Complaint, emphasis is contained in the original unless otherwise noted.

Corporation (formerly R.H. Donnelley Corporation), a marketing services company, from May 2003 until June 2010.

**Defendant Hoehn**

31.    Defendant Daniel W. Hoehn ("Hoehn") has served as the Company's Vice President, Controller and Chief Accounting Officer since March 2015.

32.    The Company's Form 10-K filed with the SEC on February 28, 2017 stated the following about Defendant Hoehn:

> Daniel W. Hoehn serves as our Vice President, Controller and Chief Accounting Officer. Mr. Hoehn joined BWC in March 2015. Formerly, Mr. Hoehn was Vice President and Controller at Chiquita Brands International, Inc., a producer and distributor of bananas and other produce, responsible for financial reporting for Chiquita's operations across three continents. From 2010 to 2013, he was Assistant Corporate Controller, after serving as Manager, Financial Reporting, from 2007 to 2010. Prior to joining Chiquita, Mr. Hoehn was a senior manager in the audit practice at KPMG, LLP.

**Defendant Kass**

33.    Defendant Leslie Kass ("Kass") has served as the Company's CEO and as a member of the Board of Directors since January 31, 2018. Prior to her appointment as CEO and director, Defendant Kass served as the Company's Senior Vice President of Industrial, and was Vice President of Investor Relations and Communications from June 2015 to August 2016. According to her LinkedIn page, she "executed the initial investor day presentation and launch of the B[&]W stock for the spin from BWC" as VP of Investor Relations and Communications.

34.    The Company's Form 8-K, filed with the SEC on February 1, 2018, noted that as CEO, Defendant Kass receives "a base salary of $750,000 per year, with a target annual bonus of 100% of base salary, subject to certain performance criteria to be established by the Compensation Committee of the Board." Further Defendant "Kass will also receive equity awards with an aggregate grant date value of $1,500,000 when the Company makes its annual equity grants to executive officers in February 2018."

35.     The Company's Form 8-K filed with the SEC on February 1, 2018 stated the

following about Defendant Kass:

> Ms. Kass, age 47, has served as Senior Vice President, Industrial of the Company
> since May 2017. She previously served in a variety of roles at the Company or its
> predecessor, including Vice President of Retrofits and Continuous Emissions
> Monitoring for the Company's Power segment from August 2016 to May 2017,
> Vice President, Investor Relations & Communications from June 2015 to August
> 2016, and Vice President of Regulatory Affairs from January 2013 to June 2015.
> Before joining the Company, Ms. Kass held a number of engineering and project
> management-related positions of increasing responsibility with Westinghouse
> Electric Company, Entergy Corporation and Duke Energy Corporation.

**Defendant Christopher**

36.     Defendant Thomas A. Christopher ("Christopher") has served as a Company

director since 2015. He also serves as a member of the Governance Committee and as a member

of the Compensation Committee. According to the 2016 Proxy Statement, as of March 11, 2016,

Defendant Christopher beneficially owned 1,960 shares of the Company's common stock. Given

that the price per share of the Company's common stock at the close of trading on March 11,

2016 was $20.01, Christopher owned over $39,219 worth of B&W stock.

37.     For the fiscal year ended December 31, 2016, Defendant Christopher received

$182,368 in compensation from the Company. This included $85,000 in fees earned or cash paid,

$94,980 in stock awards, and $2,388 in all other compensation.

38.     The Company's 2017 Proxy Statement stated the following about Defendant

Christopher:

> Following his retirement in 2009, Mr. Christopher has provided independent
> consultant services to various energy industry participants. He serves as a member
> of the Operating Advisory Board of Fort Point Capital, a private equity firm. He
> also teaches a graduate-level course in management principles at the University of
> Pittsburgh. From January 2009 until his retirement in June 2009, Mr. Christopher
> served as the Vice Chairman of Areva NP Inc. ("Areva"), a commercial nuclear
> power engineering, fuel and nuclear services company. Previously, he served as
> Areva's President and Chief Executive Officer from April 2000 to January 2009
> and served on Areva's global Executive Committee in France from January 2005

until December 2008. Prior to joining Areva in 2000, Mr. Christopher served as
Vice President and General Manager of Siemens/Westinghouse Power Services
Divisions since August 1998, Vice President and General Manager of
Westinghouse Energy Services Divisions from January 1996 until August 1998,
and Vice President and General Manager of Westinghouse Global Nuclear
Service Divisions from July 1982 until December 1996. Mr. Christopher also
spent six years with the U.S. Navy as an officer in the nuclear submarine force,
holding the naval reactors engineer certification.

Mr. Christopher brings an extensive and unique understanding of fossil power
operations, the power market and power engineering to the Company's board of
directors. As an energy business executive, he is familiar with our key customers
and their investment decision making process. He is also experienced in managing
international operations for energy services companies throughout the world.
Mr. Christopher's management experience and technical background in the
energy industry make him well qualified to serve on our board of directors.

**Defendant Dubin**

39.     Defendant Cynthia S. Dubin ("Dubin") has served as a Company director since

2015. She also serves as a member of the Audit and Finance Committee and as a member of the

Governance Committee. According to the 2016 Proxy Statement, as of March 11, 2016,

Defendant Dubin beneficially owned 6,030 shares of the Company's common stock. Given that

the price per share of the Company's common stock at the close of trading on March 11, 2016

was $20.01, Dubin owned over $120,660 worth of B&W stock.

40.     For the fiscal year ended December 31, 2016, Defendant Dubin received

$193,303 in compensation from the Company. This included $85,000 in fees earned or cash paid,

$94,980 in stock awards, and $13,323 in all other compensation.

41.     The Company's 2017 Proxy Statement stated the following about Defendant

Dubin:

From November 2011 through January 2016, Ms. Dubin served as Finance
Director of JKX Oil & Gas plc, a publicly held oil and gas exploration,
development and production company. Prior to joining JKX Oil & Gas plc, she
co-founded and served as Chief Financial Officer of Canamens Energy Limited,
an oil and gas exploration and production company focused on the Caspian, North
Africa, Middle East and North Sea regions, from 2006 to 2011. Prior to joining

Canamens Energy Limited, Ms. Dubin served as Vice President and Finance Director, Europe, Middle East and Africa Division for Edison Mission Energy, a U.S. owned electric power generator which developed, acquired, financed, owned and operated reliable and efficient power systems. Ms. Dubin started her career at The Bank of New York and Mitsubishi Bank advising on and lending to large energy projects.

Ms. Dubin brings valuable finance and energy industry experience to the Company's board as well as a unique understanding of the global and European energy markets. With more than 30 years of experience in the energy sector combined with her financial expertise and her international leadership experience, Ms. Dubin is a valuable member of our board of directors.

**Defendant Ferraioli**

42.     Defendant Brian K. Ferraioli ("Ferraioli") has served as a Company director since 2015. He also serves as Chairman of the Audit and Finance Committee and as a member of the Governance Committee. According to the 2016 Proxy Statement, as of March 11, 2016, Defendant Ferraioli beneficially owned 1,795 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2016 was $20.01, Ferraioli owned over $35,917 worth of B&W stock.

43.     For the fiscal year ended December 31, 2016, Defendant Ferraioli received $198,293 in compensation from the Company. This included $100,000 in fees earned or cash paid, $94,980 in stock awards, and $3,313 in all other compensation.

44.     The Company's 2017 Proxy Statement stated the following about Defendant Ferraioli:

From October 2013 through February 2017, Mr. Ferraioli served as Executive Vice President and Chief Financial Officer of KBR, Inc., a global engineering, construction and services company supporting the energy, hydrocarbons, power, mineral, civil infrastructure, government services, industrial and commercial markets. Prior to joining KBR, Inc., he served as Executive Vice President and Chief Financial Officer of The Shaw Group, Inc., a former NYSE listed global provider of technology, engineering, procurement, construction, maintenance, fabrication, manufacturing, consulting, remediation, and facilities management services to a diverse client base that includes regulated electric utilities, independent and merchant power producers, government agencies, multinational

and national oil companies, and industrial corporations. Mr. Ferraioli was with
Shaw from July 2007 until February 2013 when the company was acquired by
Chicago Bridge & Iron Company N.V. His earlier positions include Vice
President and Controller for Foster Wheeler, AG, a global engineering and
construction company, and Vice President and Chief Financial Officer of Foster
Wheeler USA and of Foster Wheeler Power Systems, Inc.

Mr. Ferraioli has over 38 years of experience in senior-level finance and
accounting roles in the engineering and construction industry. In addition, his
extensive background with publicly traded companies makes him a valuable
member of our board of directors.

**Defendant Hanks**

45.     Defendant Stephen G. Hanks ("Hanks") has served as a Company director since
2015. He also serves as Lead Independent Director, Chairman of the Governance Committee,
and as a member of the Compensation Committee. According to the 2016 Proxy Statement, as of
March 11, 2016, Defendant Hanks beneficially owned 12,439 shares of the Company's common
stock. Given that the price per share of the Company's common stock at the close of trading on
March 11, 2016 was $20.01, Hanks owned over $248,904 worth of B&W stock.

46.     For the fiscal year ended December 31, 2016, Defendant Hanks received
$214,271 in compensation from the Company. This included $115,000 in fees earned or cash
paid, $94,980 in stock awards, and $4,291 in all other compensation.

47.     The Company's 2017 Proxy Statement stated the following about Defendant
Hanks:

Mr. Hanks is the former President and CEO of Washington Group International,
Inc. ("Washington Group"), a global integrated engineering, construction and
management services company, which merged with URS Corporation. He also
served on its Board of Directors. Mr. Hanks has been retired since January 2008
and serves as a member of the board of directors of Lincoln Electric Holdings,
Inc. (since 2006) and McDermott International, Inc. ("McDermott") (since 2009).

Mr. Hanks brings to the Company's board of directors valuable operations,
industry and legal experience through his 30-year background with Washington
Group and its predecessor, Morrison Knudsen Corporation. He also provides
financial experience, having served as Chief Financial Officer of Morrison

14

Knudsen Corporation, and public company board experience through his service on the boards of Lincoln Electric Holdings, Inc. and McDermott. In addition, Mr. Hanks' in-depth knowledge of corporate governance practices make him well qualified to serve on our board of directors.

**Defendant Pramaggiore**

48.    Defendant Anne R. Pramaggiore ("Pramaggiore") has served as a Company director since 2015. She also serves as a member of the Audit and Finance Committee and as a member of the Compensation Committee. According to the 2016 Proxy Statement, as of March 11, 2016, Defendant Pramaggiore beneficially owned 13,071 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2016 was $20.01, Pramaggiore owned over $261,550 worth of B&W stock.

49.    For the fiscal year ended December 31, 2016, Defendant Pramaggiore received $179,980 in compensation from the Company. This included $85,000 in fees earned or cash paid and $94,980 in stock awards.

50.    The Company's 2017 Proxy Statement stated the following about Defendant Pramaggiore:

Since February 24, 2012, Ms. Pramaggiore has served as President and Chief Executive Officer of Commonwealth Edison Company ("ComEd"), an electric utility company. Prior to her current position, she served as ComEd's President and Chief Operating Officer from May 2009 through February 23, 2012. Ms. Pramaggiore joined ComEd in 1998 and served as its Executive Vice President, Customer Operations, Regulatory and External Affairs from September 2007 to May 2009, Senior Vice President, Regulatory and External Affairs from November 2005 to September 2007, and Vice President, Regulatory and External Affairs from October 2002 to November 2005. She also served as its Lead Counsel. Ms. Pramaggiore has also served as a member of the Board of Directors of Motorola Solutions, Inc. since January 2013. In addition, Ms Pramaggiore serves as a board member on the Chicago Federal Reserve Board.

Ms. Pramaggiore is a licensed attorney and brings to the Company's board of directors extensive experience in the utilities industry, as highlighted by her years of service at ComEd. Her experience as a current executive at another public company and her perspective on the technical, regulatory, operational and

financial aspects of the power industry make her well qualified to serve on our board of directors.

51.     The 2017 Proxy Statement notes that Defendant Pramaggiore is currently an officer of an entity with which the Company has transacted business in the ordinary course during the last three years. Upon information and belief, this entity is Commonwealth Edison Company, an electric utility company.

**Defendant Weyers**

52.     Defendant Larry L. Weyers ("Weyers") has served as a Company director since 2015. He also serves as Chairman of the Compensation Committee and as a member of the Audit and Finance Committee. According to the 2016 Proxy Statement, as of March 11, 2016, Defendant Weyers beneficially owned 10,834 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 11, 2016 was $20.01, Weyers owned over $216,788 worth of B&W stock.

53.     For the fiscal year ended December 31, 2016, Defendant Weyers received $196,601 in compensation from the Company. This included $95,000 in fees earned or cash paid, $94,980 in stock awards, and $6,621 in all other compensation.

54.     The Company's 2017 Proxy Statement stated the following about Defendant Weyers:

> In March 2010, Mr. Weyers retired as Chairman of Integrys Energy Group, Inc. (previously WPS Resources Corporation), a holding company with operations providing products and services in regulated and non-regulated energy markets. Previously, he served as its Chairman, President and Chief Executive Officer from February 1998 to December 2008, having joined Wisconsin Public Service Corporation, a utility subsidiary of Integrys Energy Group, Inc., in 1985. From 1998 through 2007, Mr. Weyers used internal growth and acquisitions to increase revenues from $878 million to $10.3 billion, increase income from $53.7 million to $251.3 million, and increase market cap from $808 million to $3.9 billion. The average annual return to stockholders exceeded 10%.

Mr. Weyers has served on boards in banking, hospital administration, electric transmission, the paper industry and insurance. Throughout his career he has served on numerous not-for-profit boards. From 2010 to 2015, he served as Vice President and Lead Director of the board of directors of Green Bay Packers, Inc., on which he served beginning in 2003.

Mr. Weyers brings a wealth of experience in the power generation industry to the Company's board of directors and possesses substantial corporate leadership and governance skills. Having served over 24 years with Integrys Energy Group, Inc., he has extensive knowledge of the utility industry and provides a valuable resource for our power generation operations.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

55.     By reason of their positions as officers, directors, and/or fiduciaries of B&W and because of their ability to control the business and corporate affairs of B&W, the Individual Defendants owed B&W and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage B&W in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of B&W and its shareholders so as to benefit all shareholders equally.

56.     Each director and officer of the Company owes to B&W and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

57.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of B&W, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

58.     To discharge their duties, the officers and directors of B&W were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

59.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of B&W, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised B&W's Board at all relevant times.

60.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

61.     To discharge their duties, the officers and directors of B&W were required to exercise reasonable and prudent supervision over the management, policies, practices, and

internal controls of the Company. By virtue of such duties, the officers and directors of B&W were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to B&W's own Code of Ethics for Chief Executive Officer and Senior Financial Officers and its Code of Business Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how B&W conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of B&W and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that B&W's operations would comply with all applicable laws and B&W's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

62.     Each of the Individual Defendants further owed to B&W and the shareholders the duty of loyalty requiring that each favor B&W's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

63.     At all times relevant hereto, the Individual Defendants were the agents of each other and of B&W and were at all times acting within the course and scope of such agency.

64.     Because of their advisory, executive, managerial, and directorial positions with B&W, each of the Individual Defendants had access to adverse, non-public information about the Company.

65.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by B&W.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

66.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

67.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the federal securities laws; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price while the Company repurchased its own stock.

68.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of B&W was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

69.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or

substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

70.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of B&W, and was at all times acting within the course and scope of such agency.

**B&W'S CODE OF ETHICS FOR CEO AND SENIOR FINANCIAL OFFICERS**

71.     Pursuant to the Company's Code of Ethics for the Chief Executive Officer and Senior Financial Officers (the "Code of Ethics"), the Code of Ethics applies to the Company's CEO, its Senior Vice President and CFO, its Senior Vice President and Treasurer, and other persons performing similar functions.

72.     The Code of Ethics provides, as to "Full and fair disclosure," that:

It is the Company's policy that the information in its public communications, including filings with the Securities and Exchange Commission, be timely and understandable and fair, complete and accurate in all material respects. Covered Employees should exercise diligence and care to do their part in acting in furtherance of this policy. Covered Employees are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the Company to anyone having a role in the Company's financial reporting and disclosure processes. Covered Employees must not directly or indirectly take any action to coerce, manipulate, mislead or fraudulently influence the Company's or its subsidiaries' independent auditors or any internal accounting or auditing personnel for the purpose or with the effect of rendering the Company's financial statements misleading, or direct anyone else to do so.

It is the responsibility of each Covered Employee to promptly bring to the attention of the Company's Disclosure Committee any material information of which the executive may become aware that affects the disclosures made by the Company in its public filings or otherwise, and otherwise to assist the Disclosure Committee in fulfilling its responsibilities. In addition, each Covered Employee shall promptly bring to the attention of the Disclosure Committee and the Internal Audit function, any information the employee may have concerning (a) deficiencies or weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial information or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

73.     The Code of Ethics provides, as to "Compliance with laws and regulations," that:

Covered Employees should comply with applicable governmental laws, rules and regulations. Although no single individual is expected to know the details of all laws, rules and regulations, Covered Employees' are seasoned executives that should recognize situations requiring advice or guidance. Each Covered Employee should promptly bring to the attention of both the Company's General Counsel and Chief Compliance Officer, evidence of any material violations of laws, rules or regulations applicable to the Company, by the Company or anyone acting on its behalf.

74.     The Code of Ethics provides, as to "Accountability," that:

Each Covered Employee will be held accountable for his or her adherence to this Code of Ethics. The failure to observe the terms of this Code of Ethics may result in disciplinary action, up to and including termination of employment. Violations of this Code of Ethics may also constitute violations of law that may result in civil and criminal penalties.

75.     In violation of the Code of Ethics, Defendants Ferland and Apker (as CEO and CFO, respectively) conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the federal securities laws. In violation of the Code of Ethics, Defendants Ferland and Apker failed to make "full and fair disclosures" and "comply with laws and regulations."

## B&W'S CODE OF BUSINESS CONDUCT

76.     B&W's Code of Business Conduct (the "Code of Conduct") applies to "all directors, officers, and all full-time, part-time, and temporary employees of the Company." Moreover, "there are several elements of the Code that describe our standard of higher ethical

conduct." Each B&W employee must acknowledge receipt of the Code of Conduct and acknowledge that they are "responsible for knowing and adhering to the standards outlined in it."

77.     The Code of Conduct provides, as to "Compliance with Laws and Regulations," that:

> We are a Global Company. Our workforce consists of citizens of many different countries and diverse cultural groups. We are subject to the laws and regulations of the United States, its states and municipalities, as well as the laws and regulations of the many other countries where we do business. It is our policy to comply with all laws and applicable regulations everywhere we engage in business.
>
> It is important that each of us is aware of relevant laws and regulations that apply to our work, and that we never intentionally engage in conduct that violates these applicable standards. Not only should we be vigilant in our compliance with all applicable laws and regulations, we should also be alert to changes in the law or new requirements that may affect our business.

78.     The Code of Conduct provides, as to "Integrity of Records and Accounting Procedures – Our Standard," that:

> We create documents and records in the normal course of business to assist in our decision-making process and to document our compliance with laws, regulations, and Company policies and procedures. All entries in the Company's books, records and accounts must be complete, accurate, and fairly reflect our business transactions conforming to applicable accounting standards and legal requirements. This pertains to all books, records and information in any medium, including hard copies, electronic records, emails, video, backup tapes and other media.
>
> Whatever your part in this process, you are required to be honest and forthcoming – if you believe a transaction or payment cannot be accurately documented without raising legal questions or embarrassing the Company, the transaction should not be completed and you should notify your supervisor.
>
> We must not improperly influence, manipulate or mislead any authorized audit, nor interfere with any auditor engaged to perform an internal independent audit of B&W books, records, processes or internal controls.
>
> Essential information used for reporting, auditing and other critical purposes must be retained in a recoverable format and it must be managed securely throughout the information's life cycle.

**No business goal of any kind is ever an excuse for misrepresenting facts or falsifying records. It is never acceptable to create false or misleading records or otherwise conceal the truth from B&W's management, auditors or regulators.**

79.     The Code of Conduct provides, as to "Employee Responsibilities" regarding "Integrity of Records and Accounting Procedures," that, "If you approve reports and/or documents created by others, read them carefully and satisfy yourself that they are complete and accurate. Your signature is important – make sure you fully understand the implications before signing off on a document."

80.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the federal securities laws. In violation of the Code of Conduct, the Individual Defendants failed to "comply with laws and regulations," maintain the "integrity of records and accounting procedures," and fulfill the employee responsibilities related thereto.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

81.     In 2015, the Company spun-off from BWX, and, on July 1, 2015, B&W became an independent, publicly traded company that operates BWX's Power Generation business. BWX did not retain any ownership interest in the Company after the Spin-off.

82.     B&W is a technology-based provider of advanced fossil and renewable power generation equipment and offers a broad suite of boiler products, environmental systems, and

services for industrial and power uses. Additionally, the Company specializes in engineering and technology for power generation and other industries, the related procurement, erection and specialty manufacturing of equipment, and the provision of related services.

83.     The Company operates in three reportable segments: Power, Renewable, and Industrial. Through the Company's Renewable Segment Business, B&W supplies steam-generating systems and auxiliary and environmental equipment for the waste-to-energy and biomass power generation industries.

### Growth in Renewable

84.     Throughout the Relevant Period, the Company moved its focus from fossil fuels to renewable energy products and services.

85.     The Company's Renewable business is predominantly conducted though Babcock & Wilcox Volund A/S ("B&W Volund"), headquartered in Esbjerg, Denmark. B&W Volund purports to specialize in the manufacture, construction, maintenance and operation of renewable energy plants, including waste-to-energy, biomass, and mixed fuel systems.

86.     During the relevant period, certain B&W executives had management roles within B&W Volund. For example, D. Paul Scavuzzo ("Scavuzzo"), who served as Senior Vice President of Global Power in 2015 and Senior Vice President of Renewable from June 2016 to December 2016 at B&W, served as B&W Volund's Chairman of the Supervisory Board. Mark S. Low ("Low"), who also held several Senior Vice President roles at B&W, was a B&W Volund board member through at least 2015.

87.     A large portion of B&W's Renewable Business—31% of Global Power's revenue and gross profit in 2014—came from B&W Volund.

88.     In 2012, B&W Volund won a $170 million contract to design the Amager Resource Center waste-to-energy plant, known as "Copenhill," in Copenhagen, Denmark; supply the combustion system from crane through feeding, grate, and broiler to ash handling; and build the particle and nitrogen-oxide reduction system. Engineering and design work began in 2012, and B&W broke ground on the project on March 4, 2013.

89.     As noted above, the Copenhill project was suffering from significant issues related to deficient piping design executed by Indian subcontractors from before the Relevant Period. This issue caused the Company to shuffle resources away from other projects to remediate the issues at Copenhill.

90.     In 2014 and 2015, B&W's Renewable segment began to book significantly more projects through B&W Volund. In addition to Copenhill, B&W Volund was engaged to:

(a)     Install two biomass boiler systems at Skaerbaek Power Station in Denmark ("Skaerbaek"). It was announced on July 23, 2014 that the contract was for over $80 million. Engineering and design work began in 2014, and the project had an estimate completion date of April 2017.

(b)     Engineer, procure and construct a waste-to-energy plant near Dunbar, Scotland. The $230 million-dollar project was announced on December 22, 2014. The plant was scheduled to go online in the fourth quarter of 2017.

(c)     Engineer, procure and operate a state-of-the-art biomass power plant in Margam, Wales ("Margam"). The $200 million project was announced January 28, 2015, with construction to be completed in the second quarter of 2017. Defendant Ferland pointed to Margam as evidence of the Company's focus on growing its international power business.

(d)     Design, manufacture and operate the Templeborough Biomass Power Plant in Rotherham, South Yorkshire, England ("Templeborough). The $220 million-dollar project, announced on March 11, 2015, was scheduled to be completed in the third quarter of 2017.

(e)     Design, build, operate and maintain the Teesside Renewable Energy Plant near Middlesbrough, England. The $190 million project, announced September 21, 2015, was scheduled to be completed in the first quarter of 2018.

(f)     Install a new waste-to-energy line at the Nordforbraending plant in Denmark, scheduled to be completed in 2016.

91.     The Company announced additional Renewable projects in 2016, including:

(a)     A $90 million contract to design, manufacture, and build a waste-to-energy plant near Haresfield, Gloucestershire, U.K., announced on January 26, 2016.

(b)     A nearly $40 million contract to design a waste-to-energy boiler for the Shenzhen Energy Environmental Engineering Co. Ltd. in Shenzhen, China, announced on November 29, 2016.

(c)     A $35 million contract to design, supply, and construct a waste-to-energy boiler for a power plant in Boden, Sweden, announced on December 21, 2016.

92.     According to CW 1,[4] a Construction Manager in B&W Volund's Denmark headquarters from approximately 2009 through May 2015 responsible for all construction site managers, the rapid revenue growth at B&W Volund created challenges for key personnel resources. CW 1 stated that the size and scope of B&W Volund's projects had expanded,

---

[4] Anonymous witnesses are identified herein with the designation "CW 1," "CW 2," etc. All such references to anonymous witnesses or employees are drawn from the Second Amended Consolidated Class Action Complaint For Violations of Securities Laws filed in the Securities Class Action on September 28, 2017, which is attached as Exhibit A hereto, and correspond to the same referenced witnesses as contained therein

necessitating the use of consultants and contractors in addition to increased hiring. CW 1 received weekly reports from all of the project sites providing details regarding construction progress at each site, which he forwarded to B&W Volund Engineering Director Lars Busch.

93.    Numerous and significant problems emerged, or continued, with at least seven Renewable Projects during the Relevant Period as a direct result of the Company's insufficient professional resources and capabilities to manage the amount of work it had contracted for.

### Cost Cutting Initiatives

94.    While the Company was obtaining more contracts in Renewable, it was also engaged in significant cost-cutting. As Defendant Apker noted at the June 17, 2017 Analyst/Investor Day event, cost-cutting measures included: (1) global manufacturing consolidation; (2) supply-chain optimization efforts; (3) engineering initiatives; (4) organizational efficiency improvements; and (5) international efficiency improvements. One engineering initiative specifically noted was the use of engineers from TBWES for certain international boiler projects. Defendant Ferland stated that one new waste-to-energy plant would "go through" TBWES.

95.    CW 2, a Process Engineer from November 2004 to 2010, and an Estimating Specialist from 2010 to June 2016 at B&W's Barberton, Ohio office, recalls B&W implementing significant cost-cutting measures in early 2015. CW 2 stated that Defendant Ferland mad a "big push" to use cheaper, inexperienced subcontractors in India for a fraction of the cost of their U.S. counterparts ($15 per hour vs. $55 per hour for a U.S. employee). According to CW 2, the Indian subcontractors' work was inferior, and routinely had to be corrected by U.S. employees in B&W's Barberton office.

96.     CW 3, a Supervisor of Marketing Strategy in the Company's Renewable segment from 2008 through June 2016 in B&W's Barberton, Ohio office, had responsibilities including assisting product managers with development and integration of strategic marketing efforts for all divisions and products. He reported that there was a declining corporate culture prior to his June 2016 departure, and Defendant Ferland ignored several red flags highlighting a declining demand and the Company's inability to deliver on Renewable projects. Specifically, CW 3 pointed to engineering errors as curtailing the Company's ability to deliver on renewable projects. The Company generally expected Renewable projects to take two to three years to complete, but CW 3 had witnessed many projects extending to four years due to multiple design and engineering problems.

97.     Although the Company represented growth of renewable energy plant contracts as the key driver of the company's future revenue growth and its cost-cutting measures as driving margins, Defendants failed to disclose that they had not built up the operational capacity necessary to perform on the contracts on budget and on schedule and that its cost-cutting measures relied on inexperienced subcontractors. As a result, the Company suffered substantial problems in the development and construction of virtually every Renewable facility for which B&W Volund received a contract from 2013 through 2015, which led to losses and substantially reduced profits for these projects and the Company's permanently ceasing bidding on renewable projects of comparable scope. Nonetheless, to maintain B&W's valuation based on its Renewable segment growth, Defendants concealed the many problems B&W was experiencing with the renewable energy projects.

***The Success of B&W's Renewable Segment was Highly Material to Investors***

98.     As the anticipated source of future growth, analysts closely followed B&W's Renewable contract signings. On July 1, 2015, for example, analyst William Blair initiated coverage of the stock with an "outperform" rating, noting:

> Despite headwinds in its legacy U.S. coal-fired power market, the company is working diligently to grow its business internationally and has shown early signs of success over the last two quarters. With a well-defined strategy and execution plan in place, Babcock & Wilcox Enterprises has established a solid set of financial targets, with more upside than downside, in our opinion. We believe there is material room for valuation multiple expansion as the company executes its strategy and is better understood by investors.

99.     Other analysts similarly based favorable ratings on B&W's representations that it intended to shift away from coal and toward renewables.

### B&W Maintained Detailed Oversight Over B&W Volund

100.    The Company maintained extensive oversight over B&W Volund's projects. Top Company executives, such as Scavuzzo and Low, sat on B&W Volund's Board of Directors. There was also substantial and detailed reporting from B&W Volund to Company executives, as reported by multiple confidential witnesses.

101.    CW 4 was a senior level construction manager at B&W Volund from late 2013 through February 2017 who personally observed the strong oversight the Company exercised over B&W Volund. B&W Volund Business Controller Todd Blevins ("Blevins") was an American expatriate and part of CW 4's management team. Blevins reported to the Company's Vice President of Finance for Global Power and had frequent, regular contact with his B&W U.S. contacts.

102.    CW 4 also described a Monthly Management Report that was prepared and transmitted to Scavuzzo and his group. The Monthly Management Report included an update on each project, describing what had happened during the prior month and what was projected for

the following month. It also identified any problems with each project and the solutions that were being developed and attempted.

103.    CW 4 stated that issues with projects—including the Copenhill, Skaerbaek and U.K. project problems described below—were "clearly communicated" by B&W Volund to the Company, through Scavuzzo and his financial controller, as soon as they were discovered. In addition to being written up in the Monthly Management Reports, they were openly discussed in phone calls and emails between B&W Volund and Company personnel.

104.    CW 4 also stated that there were Quarterly Performance Conference Calls with Scavuzzo and his group, which included a budget update and a discussion of selected projects. CW 4 recalled that the Copenhill, Skaerbaek, and U.K. projects were discussed on the Quarterly Performance Conference Calls with Scavuzzo. Similar monthly Performance Calls were held internally at B&W Volund.

105.    CW 5 was a mid-level manager involved in the day-to-day project management for B&W Volund from 2012 through mad-2016. Although based in B&W Volund's headquarters in Esbjerg, Denmark, CW5 worked mainly out of the Copenhagen office pursuant to his work on Copenhill. According to CW 5, the Project Manager and Controller for each project had to prepare monthly reports designed by the Company, written in English, to be presented to B&W Volund senior management. CW 5 stated that the reports included information on scheduling, delays, any new subcontractors, budget to actual data, work completed to date, work in progress, forecasted work remaining, risks, and a new budget, if any. CW 5 said that these monthly reports were sent to and reviewed by Company management, and that his team would sometimes receive questions from the U.S., which were conveyed by either B&W Volund's CFO or B&W Volund's Director of New Energy Plants.

106.    Additionally, CW 5 stated that a Project or Commissioning Manager named Gary from the Company's Barberton, Ohio office visited B&W Volund in approximately January 2016 to report back to U.S. leadership on the progress and problems at Copenhill. Additionally, a financial professional from B&W U.S., who reported to a senior financial professional at the B&W Barberton, Ohio office was on site at B&W Volund from June 2015 through at least June 2016. CW 5 also recalled receiving occasional questions from the Company concerning the Copenhill project.

107.    CW 2 confirmed CW 5's account that Monthly Reports were issued on each project. CW 2 stated that these reports indicated when the Company began to experience delays on the projects, including those undertaken through B&W Volund. CW 2 also stated that the Company had additional reports, called Accounting Reports, which were prepared by the Company Controllers and shared with the Project Managers. These accounting reports included descriptions of the project's initial budget, costs to date, anticipated costs to complete, and other similar information. CW 2 reported that each quarter, the Project Managers would present details from the Monthly Reports and Accounting Reports to B&W's senior management, including J. Randall Data, Low, Brandy Johnson, and Walt Nischt. CW 2 further stated that both the Monthly Reports and the Accounting Reports were available via the Company's intranet site.

108.    CW 6 was a Technical Coordinator/Senior Engineer at B&W Volund from mid-January 2017 through mid-May 2017, involved with the U.K. projects. CW 6 said that milestone reports were routinely provided from Department Managers to Project Managers to Project Directors, and ultimately to the Company, and that these lines of communication were in place prior to when he joined B&W Volund.

109.   At the beginning of the Relevant Period, the Company was experiencing significant, undisclosed problems with the engineering design for the Copenhill project. CW 1 reported that Copenhill was sold as a low margin project.

110.   CW 5 stated that work on Copenhill began in 2012 with Process Design, which took approximately eighteen months and involved the efforts of approximately 120 engineers. CW 5 stated that Pipe Design began during Process design and was initially being performed by B&W Volund, but independent contractors were quickly brought in to assist.[5] According to CW 5, pipe design is not complicated, but it must proceed in the proper order or else it can result in incorrect stress calculations for the pipes. CW 5 further explained that running steam through pipes makes them hot and forces them to expand, increasing the stress on the pipes. If stress calculations are incorrect, pipes may exceed the allowable stress and "blow."

111.   According to CW 5, a typical Renewable project at B&W used approximately 30 tons of piping. Copenhill called for two boilers and a much higher tonnage of piping.

112.   CW 5 asserted that many independent contractors were engaged to work on the pipe design. However, CW 5 considered the people used to be the "wrong guys" for the job, due to their lack of relevant experience.

113.   Upon observation of a growing piping problem, CW 5 discussed the issue with B&W Volund Managing Director John Veje Olesen, Jorgensen, and B&W Volund engineering director Busch. He also raised the issue in his monthly reports starting in 2014, and reported the problem to his supervisor, the Director of New Energy Plants, and to Nils Peter, the Department Manager for the Piping Department. CW 5 was concerned with the calculations he was running

---

[5] Defendant Ferland explained in a June 28, 2016 call with analysts discussing the Copenhill project that "we typically do in-house or certainly control[] in-house, the basic piping design in stress analysis work. Quite often on larger projects like this we utilize some outside resources to supplement our engineering but we remain in control of oversight and management on all that work."

concerning the weight of steel being dedicated to piping versus that for support beams and structures. CW 5 stated that the piping weight figures being supplied by B&W Volund staff to Busch were wrong and different from the figures supplied to CW 5 by contractors performing the work.

114.    CW 5 approached CEO Olsen in November 2015 with his own calculation related to the piping design, specifically the amount of steel allocated to piping versus the amount allocated to support beams. CW 5 said that Olesen was immediately concerned about the Copenhill piping design issues and asked Busch to spot check the piping with an experienced piping engineer. CW 5 asserted that at this point, there was not a single B&W Volund piping engineer assigned to the project, so Busch tapped B&W Volund Lead Engineer Niels Beck Nielsen from another project. Nielsen performed the spot checks and confirmed to Olesen that the piping was wrong. CW 5 reported that further checks confirmed that largely all of the piping was incorrect and had to be redone. CW 5's report is confirmed by Nielsen's LinkedIn page, which asserts that he was made Piping Lead for Copenhill in November 2015.

115.    CW 4 remembered hearing about significant problems with a defectively designed piping system at Copenhill around Christmas 2015, which was around the time that a B&W Volund working group or task force was formed to dig into the problems. CW 4 stated that the piping design was based on incorrect stress calculations and that the piping and other areas of the plant could have been destroyed if the plant had gone into operation due to the pressure generated by the system.

116.    Correcting the problems created by the faulty piping design required reworking the piping engineering, redesigning, and resizing the pipes, according to CW 5. CW 5 stated that Copenhill had a piping engineering budget of less than 5,000 hours. At the time of CW 5's

departure in June 2016, this budget had been vastly exceeded, with more than 40,000 piping engineering hours expended despite the project remaining incomplete.

117.    CW 4 stated that the piping design error should never have occurred in the first place, resulting in huge cost overruns that quadrupled or quintupled the budgeted costs of the project.

118.    Copenhill was not the only B&W facility experiencing problems at the beginning of the Relevant Period. The Skaerbaek plant, owned by DONG Energy Thermal Power A/S, was to consist of two 140 MW biomass-fired boilers to supply district heating and power to residents of the region. The boilers were to be designed and built by B&W Volund and fueled primarily by wood chips and other biomass residue. B&W Volund's role was to design, manufacture, supply, construct and commission the plant's boiler system. B&W Volund began engineering and design work for the Skaerbaek project in 2014, projecting completion in April 2017.

119.    CW 1, a B&W Volund Construction Manager from 2009 through May 2015 with responsibility for all construction site managers, stated that Skaerbaek suffered from many problems which arose in 2014 and 2015, including a defective boiler and production problems. According to CW 1, the defective boiler was manufactured in India by TBWES.[6] CW 2 stated that the welding on the boiler was inadequate and had to be redone. Likewise, CW 7, a B&W Volund Construction Manager from October 2015 through February 2017 with responsibility for Skaerbaek and several other projects,[7] stated that the boiler they received was pure scrap, and fixing it cost the Company six months' work and approximately 40 million Danish krones

---

[6] Although CW 1 had left B&W Volund prior to the delivery of the boiler, he learned of its deficiencies through his ongoing contacts with B&W Volund employees.

[7] CW 7, who worked out of B&W Volund's headquarters in Esbjerg, Denmark, had responsibilities encompassing all B&W Volund construction projects, and included management responsibility for site management and site supervisors. CW 7 reported to the Manger for Construction, Knud Boesvang, who reported to the Director for Service and Production.

(approximately $8 million). CW 7 further recalled that the Company had to call in approximately 150 extra welders to remedy the problem.

120.    According to CW 4, shipments related to Skaerbaek continued through 2016 and the situation grew worse and worse. CW 4 stated that coordination for resolving the problem was run through B&W's U.S. offices. CW 4 further explained that issues were highlighted for B&W in the Monthly Management Report, and conference calls and meetings were held between the Company and B&W Volund to identify, understand, and resolve the issues. CW 4 stated that B&W dealt with the Indian manufacturer while B&W Volund primarily managed the relationship with the customer (DONG Energy). CW 4 estimated the cost of resolving the issue at approximately $10 million.

121.    The cost overruns at Skaerbaek were exacerbated in early 2016 when the Company diverted engineering and other resources and personnel to Copenhill for approximately twelve months. As disclosed in the Company's Form 10-K for the year ended December 31, 2016, Skaerbaek became a loss contract for B&W in the fourth quarter of 2016 due to $30.1 million in charges recorded related to the project ($25.2 million in the fourth quarter alone). By December 31, 2016, B&W also recorded estimated liquidated damages of $6.9 million for the Skaerbaek project.

122.    CW 11 worked for B&W Volund as a Piping Engineer from October 2016 until April 2017. According to CW 11, various problems existed with Skaerbaek when he began working for B&W Volund in late 2016, and the project was "in a bit of a state." CW 11 was retained specifically to help fix the ongoing problems and was "trouble-shooting on a daily basis." According to CW 11, the main issue at Skaerbaek was that there were not enough employees working on the project. CW 11 felt that each project needed ten to twenty workers,

but Skaerbaek had only a "small squad" comprised of approximately five workers. This understaffing resulted in delays and employees taking "shortcuts." Understaffing and lack of employee knowledge meant that the 3-D Computer Aided Design software was being used improperly, as the "catalogue and specification" system was not being employed as it should have been for modeling, which led to "everything not being correct in the 3-D model," and work being done twice. Because of the lack of resources, the Skaerbaek project was "massively behind schedule." CW 11 was pulled from Skaerbaek in January 2017, with the project only about 90% complete.

123.   According to the Form 10-Q filed with the SEC for the quarter ended June 30, 2017, the Company recorded additional contract losses on the Skaerbaek project due to increased estimated costs to finish the project:

> During the three and six months ended June 30, 2017, we recognized additional contract losses of $2.7 million and $5.5 million, respectively, as a result of changes in the estimated costs at completion. Our estimate at completion as of June 30, 2017 includes $7.3 million of total expected liquidated damages for schedule delays. As of June 30, 2017, the reserve for estimated contract losses recorded in "other accrued liabilities" in our consolidated balance sheet was $1.5 million.

**The Individual Defendants Knew that Fixing Engineering Design Flaws at Copenhill would Negatively Impact Progress and Profitability of Several Other Renewable Projects**

124.   According to CW 4, once projects started losing money, the Company became substantially involved in the decision-making process. CW 4 stated that B&W directed B&W Volund to divert staff from other projects to fix the piping design problems at Copenhill. CW 5 confirmed that, beginning in January 2016, at least ten to fifteen engineers were diverted from three B&W Volund U.K. projects (Margam, Teesside, and Dunbar) to work on the Copenhill project after the piping problems were brought to a head. At this time, CW 5 added that Busch

and Nielsen took responsibility for the piping of Copenhill and supervised the engineers brought over to work on it. Those engineers remained on the Copenhill project through at least June 2016, according to CW 5.

125.    According to CW 4, the U.K. projects were much larger than those previously performed by B&W Volund, and the construction organizations at the projects were new. CW 4 stated that the diversion of human resources to Copenhill meant that B&W Volund did not have enough qualified personnel on site at the U.K. projects, and inexperienced management caused delays and budget issues with the U.K. projects.

126.    CW 4 further stated that because he was needed on site at Copenhill and Skaerbaek from approximately April 2016 through August 2016, CW 4 had to cut down on travel to the U.K. project locations.

127.    According to CW 4, the Company was expressly warned that focus on Copenhill would cause losses on other projects. CW 4 recalled that B&W Volund CEO Olesen discussed the issued with Company management and expressed concern that B&W had "put all their eggs in one basket" with their decision to focus on Copenhill. CW 4 said Olesen warned that the Company would lose time and money on its other projects because of the decision to focus on Copenhill, and that the other projects would suffer untimely procurement and completion as a result.

128.    In addition to diverting staff from other projects, CW 4 stated that B&W dispatched engineers, construction personnel, and other personnel to assist with procurement from its U.S. offices to Demark to assist with the Copenhill problems. These B&W personnel added an additional layer to the decision-making process at Copenhill as they needed high level

approval from B&W management for any decisions. The B&W personnel participated in normal project meetings and reported back to B&W management.

129.    CW 4 stated that, as predicted, the diversion of staff from other projects to Copenhill created problems in the other projects, including delays and budget overruns. Additionally, CW 5 learned from the Norfors Project Manager, Per Rams, that the Norfors project experienced piping design problems as well. CW 5 expected that the U.K. projects would also experience problems with their piping and learned from former colleagues after leaving B&W Volund in June 2016 that the U.K. projects did, in fact, have piping problems.

***The Individual Defendants Were Aware of Significant Problems at Other Renewable Projects Throughout the Relevant Period***

130.    As revealed by the dramatic, negative market reaction to the Company's disclosure of the Copenhill problems on June 28, 2016, those issues alone were of great concern to investors. However, in addition to the problems at Copenhill and Skaerbaek discussed above, numerous other projects experienced significant delays which, had they been publicly disclosed, would have placed investors on notice of the Company's inability to realize the value of its Renewable backlog and execute its publicly stated Renewable growth goals.

**Norfors**

131.    As noted above, the Company announced the Norfors contract in July 2013. B&W Volund was to supply waste-firing equipment, including an advanced DynaGrate® combustion grate for the plant's steam generator. The new facility was projected to burn 80,000 tons of waste per year. Start-up of the plant was anticipated for spring 2016.

132.    According to CW 5, the Norfors project was also experiencing piping design problems, which CW 5 learned about from Norfors Project Manager, Per Rams. Norfors and

Copenhill were worked on by B&W Volund simultaneously, with Norfors being the smaller project. CW 8, who worked as a process engineer in B&W's Golstrup, Denmark office from April 2013 to June 2016, confirmed that the Norfors project suffered from several problems, including planning issues, contract requirement/identification issues, client permitting problems, environmental permit issues and construction permit issues. CW 8 stated that these problems caused delays and put the project behind schedule.

### U.K. Plants

133.    B&W Volund won several projects in the U.K. in 2014 and 2015, as noted above. The U.K. projects were larger than those B&W Volund had undertaken previously. CW 4 stated that it was clear that the B&W team had a good understanding of challenges inherent in doubling and tripling its revenues from the project business and entering into new contract types within the U.K., that is, the Company's U.S. management had clear knowledge of that types of projects were being undertaken in the U.K., as well as their associated risks. CW 4 indicated that he believed that the commitment to the U.K. projects, in addition to existing problems at Copenhill, placed B&W Volund under incredible pressure. CW 4 indicated that this was no surprise, as the construction organization at the U.K. projects was new and it was known that it would be problematic from the start.

134.    CW 1 confirmed that the U.K. project contracts were larger in size and scope than B&W Volund's previous contracts. At the time of CW-1's departure in May 2015, he stated that there were significant problems with the U.K. projects due to delays caused by the civil engineers. Additionally, CW 1 anticipated more problems arising in these projects because three of them started at approximately the same time, stretching company resources, and B&W Volund was experiencing problems with its partners on the projects.

135.    CW 12 was a senior level B&W Volund employee from August 2016 to mid-July 2017 and was involved in piping engineering and responsible for expediting and follow-up detail engineering and prefabrication for the Margam, Templeborough, and Teesside projects. CW 12 was responsible for progress reporting, design inspection, sub-supplier audits, and solving technical queries for these Renewable projects.

136.    CW 12 stated that the main problem with these projects was that B&W Volund had taken on these big contracts without procedures or models for Engineering, Procurement, Construction, and Installation ("EPCI") execution. He immediately recognized that B&W did not have "site execution" models (i.e., electrical, piping, and structural) or EPCI plans at these facilities, despite these being common arrangements used in the renewable energy construction process. CW 12 also stated that the basic design was released too early to the detail design contractor, resulting in many changes to the basic design. He witnessed many piping design problems and issues with poor communication between project manager and suppliers at the three projects, which resulted in missed milestones.

137.    Knowing that they would not be meeting project deadlines, in mid-September 2016 there was a meeting in Copenhagen that CW 12 attended between certain B&W Volund Project Managers (including at least Johannes Engelsby Hansen (Margam Project Manager) and Clause Risum Korsgaard (Templeborough Project Leader)) and project managers with the subcontractor responsible for detailed designs, prefabrication and onsite assembly of piping for the projects. At the meeting, the subcontractor's project managers reiterated their concerns that the sites were not ready for them to start work as they were still missing basic necessities such as areas for site fabrication and storage, electric power, and facilities for the workers. CW 12 stated

that the subcontractor also warned that the projects were "moving too fast" and had basic design flaws.

138.    According to CW 12, by July 2017, the issues at the Margam, Templeborough, and Teesside projects were improving, but "there was no way to save these projects . . . the damage was already done."

139.    CW 13 was formerly on the Managers Team of a subcontractor with responsibility for managing pipe designs and design corrections for some of B&W Volunds' projections including the Margam, Templeborough, and Teesside projects. CW 13 worked for the subcontractor for approximately nine years (2008 to the end of 2016). CW 13 indicated that his subcontractor employer was contracted by B&W Volund in Spring 2016 to provide detailed designs, prefabrication, and onsite assembly of piping for projects including Margam, Templeborough, and Teesside. CW 13 explained that B&W Volund would provide the initial basic designs of the projects, and the company he worked for would then create more detailed designs based upon them. Prefabrication included welding together pipes and providing bends for pipes, after which the subcontractor would assemble pipes at job sites, according to CW 13.

140.    CW 13 indicated that the Margam, Templeborough, and Teesside projects all experienced serious delays due to B&W Volund's poor basic designs for these projects. CW 13 recalled that when his company first received the basic piping designs for Margam, Templeborough and Teesside, it had to correct flaws in those basic designs, including incorrect pipe diameters for pipes requiring bends and other design miscalculations. CW 13 further stated that his company sent lists with hundreds of design changes to B&W Volund for approval, which led to weeks of back and forth before approval for the changes was given. According to CW 13, this caused further delay in the scheduling of other aspects of these three projects.

141.    CW 13 recalled that around September 2016, B&W employees began making regular visits to B&W Volund projects, including Copenhill, Margam, Templeborough, and Teesside. CW 13 confirmed that one B&W employee would stay in Europe for a few weeks, then be replaced by another B&W employee. CW 13 confirmed that this was because the projects were behind schedule. CW 13 recalled one such B&W employee, Matt Kurian, who came from the B&W location in Ohio to B&W Volund around September 2016. According to CW 13, Kurian was kept well-informed about delays and problems being experienced at Margam, Templeborough, and Teesside by several means during this time. Such means included daily conference calls via Skype with B&W Volund management in which Kurian often participated; in-person on site meetings with subcontractors including CW 13; email communications from CW 13 to Kurian; and bi-weekly in-person meetings at B&W Volund that Kurian and CW 13 both attended.

142.    CW 6 was a Technical Coordinator/Senior Engineer at B&W Volund from mid-January 2017 to mid-May 2017 with responsibility for the projects in Dunbar, Margam, Templeborough, and Teesside. Specifically, he was responsible for following up and monitoring the progress of the subcontractors, which comprised a significant proportion of the workforce. According to CW 6, each of these projects were behind schedule when he started in min-January 2017. He stated that the problems originated from shoddy original design and poor communication to inexperienced subcontractors who were frequently being replaced by project managers who were also unfamiliar with proper turnkey production. CW 6 learned of several flaws in the original designs of these projects, including incorrect stress calculations in the piping design and foundation design errors. Additionally, there were no proper execution models provided by the project managers.

143.    B&W announced that in the fourth quarter of 2016, two of the U.K. projects had become loss contracts and two others suffered reduced profitability due to delays caused by the diversion of staffing resources from these projects to Copenhill. Specifically, one of the U.K. projects incurred charges of $28.1 million for 2016 (with $23.0 million of the total in the fourth quarter) and another U.K. project recognized a charge of $16.4 million for 2016 ($16.2 million of which was in the fourth quarter).

144.    Details of problems and delays at specific U.K. projects follow.

(a)    **Dunbar**

145.    On December 22, 2014, the Company announced that a consortium including B&W Volund had been awarded a $230 million contract to engineer, procure, and construct a waste-to-energy power plant near Dunbar, Scotland. Viridor U.K. selected B&W Volund and its construction partner, Interserve Strategic Projects, to design and build the plant. B&W Volund's scope purportedly accounted for two-thirds of the contract value and included two waste-to-energy boilers, advanced DynaGrate® dynamic fuel combustion system, steam turbine, and a dry flue gas cleaning system. The plant was scheduled to go online in the fourth quarter of 2017.

146.    CW 9 worked as a mid-level manager involved in the day to day project management for B&W Volund's subsidiary, Miljo, in Gothenburg, Sweden from approximately April 2015 through February 2017. During his tenure, CW 9 worked on two B&W Volund projects in the U.K., both of which experienced problems: the Dunbar waste to energy plant in Scotland, and the Teesside project in Port Clarence, England. According to CW 9, the Dunbar plant experienced problems and delays resulting from the work or inefficiency of B&W's main construction partner, Interserve. CW 9 and his team were working on delivering flue gas abatement treatments on the two-boiler projects at Dunbar. CW 9 explained, based on his on-site

observations, that B&W Volund had to frequently revise time schedules and deliveries attributable to the phase of the project due to delays caused by Interserve.

147.    Also, as noted above, CW 5 was aware of engineers being diverted form the U.K. projects to work on Copenhill starting in approximately January 2016 and continuing through at least June 2016. CW 5 expected that the U.K. projects would experience problems with their piping and learned from former colleagues after leaving B&W Volund that they did have piping problems.

148.    CW 9 stated that the Dunbar project team met weekly or at least bi-weekly and reported out. CW 9 sent data concerning Interserve delays to the B&W Volund Project Director for Dunbar, Peter Gedbjerg, who reported the data to the B&W Volund Director of New Energy Plants at least monthly.

149.    CW 11 worked on the Dunbar project for about eight weeks, beginning in January 2017. CW 11 indicated that the Dunbar project suffered from engineering issues like those at the Skaerbaek project. In addition, B&W Volund hired a Croatian contractor, which, according to CW 11, provided "cheap labor." Retaining the Croatian contractor caused delays due to "lots of poor communication" and mistakes, putting the project further behind schedule. CW 11 reported that, because of these mistakes, some of the work at Dunbar had to be done twice.

150.    The Company's Form 10-Q for the quarter ended June 30, 2017 noted that B&W recorded contract losses on the Dunbar project due to increased estimated construction costs to finish the project and schedule delays.

(b)    **Margam**

151.    On January 28, 2015, B&W announced that B&W Volund had been awarded contracts by Margam Green Energy Ltd. for services related to a state-of-the-art biomass power

plant in Margam, Wales. The plant would feature advanced environmental controls designed by B&W Volund and its Götaverken Miljö AB subsidiary, including a dry flue gas desulfurization system (dry FGD), fabric filter baghouse, continuous emissions monitoring equipment, and advanced DynaGrate® dynamic fuel combustion system. Construction was scheduled to be completed in the second quarter of 2017.

152.    According to the press release announcing the award of the project, Defendant Ferland confirmed that the project demonstrated the Company's focus on growing its international power business, stating that

> The Margam project is the fifth major coal, renewable or waste-to-energy contract announced by B&W's power generation subsidiary in the last seven months . . . We continue to look globally for opportunities to grow our business in the fossil power and renewable sectors, while maintaining limited exposure to the impact of a turbulent global oil market."

153.    CW 10 was a supervisor for B&W Volund from October 2015 to August 2016 who reported to Site Manager Brian Nielsen and worked on two U.K. projects, Margam and Templeborough. CW 10 reported that, from the outset, both projects experienced problems with labor shortages and issues with B&W Volund partner Interserve. CW 10 explained that Interserve was not familiar with and did not understand power plant construction, leading to mistakes and delays. Interserve reportedly created "a lot of problems" during the project. CW 10 further stated that B&W had contracted with Portuguese steel erectors and Croatian boiler makers who had difficulty gaining permission to work due to Construction Design and Management regulations in the U.K., which created manpower shortages and delays in work and deliveries. Because of these issues and related delays, project schedules had to be adjusted.

154.    CW 7 confirmed that B&W Volund experienced problems with the principal contractors at the U.K. sites and that these problems caused delays. Like CW 10, CW 7 reported that the contractors did not know how to build power plants and that the contractors knew

nothing about running projects. CW 7 explained that despite this lack of knowledge, the contractors could and did overrule B&W Volund on issues and the multiple levels of supervision created further issues. While CW 7 was responsible for supervising construction, CW 10 could not manage the contractors' work because they had their own supervisors.

155.    As noted above, CW 5 was aware of engineers being diverted from the U.K. projects to work on Copenhill starting in approximately January 2016 and continuing through at least June 2016. CW 5 expected that the U.K. projects would experience problems with their piping and learned from former colleagues after leaving B&W Volund that they did, in fact, have piping problems.

156.    The Company's Form 10-Q for the quarter ended June 30, 2017 noted that B&W recorded contract losses on the Margam project due to increased estimated construction costs to finish the project and schedule delays.

(c)    **Templeborough**

157.    Announced on March 11, 2015, these contracts awarded to B&W Volund and Interserve Strategic Projects, valued at over $220 million, were scheduled to be completed in the third quarter of 2017.

158.    As described by CW 10 in connection with Margam, above, Templeborough experienced issues with Interserve due to Interserve's lack of familiarity with, or understanding of, power plant construction, which caused mistakes and delayed construction.

159.    The Company's Form 10-Q for the quarter ended June 30, 2017 noted that B&W recorded contract losses on the Templeborough project due to increased estimated construction costs to finish the project and schedule delays.

(d)    **Teesside**

160.     Announced on September 21, 2015, this contract to design and build the Teesside Renewable Energy Plant was scheduled to be completed in the first quarter of 2018. The Company was also awarded a contract to operate and maintain the plant for fifteen years following construction. Together, the contracts totaled over $190 million. The construction contract included a boiler and environmental controls designed by B&W Volund and its Götaverken Miljö AB subsidiary.

161.     CW 9 reported that Teesside experienced delays. CW 9 and his team were working on delivering flue gas abatement treatments at Teesside. The time schedule problems and resulting delays were exacerbated by serious union and employment issues in the industrial community surrounding the site.

162.     CW 9 reported that the Teesside project team met weekly or at least bi-weekly and had the same reporting obligations to the B&W Volund Director of New Energy Plants as applied to Dunbar.

163.     As noted above, CW 5 was aware of engineers being diverted from the U.K. projects to work on Copenhill starting in approximately January 2016 and continuing through at least June 2016. CW 5 expected that the U.K. projects would experience problems with their piping and learned from former colleagues after leaving B&W Volund that they did, in fact, have piping problems.

164.     The Company's Form 10-Q for the quarter ended June 30, 2017 noted that B&W recorded contract losses on the Teesside project due to increased estimated construction costs to finish the project and schedule delays.

***Growth in the Renewable Segment was a Critical Element of the Company's Success Following the Spin-Off***

165.    CW 4 reported that prior to the Relevant Period, B&W Volund was relatively small and grew substantially as it acquired more projects between 2014 and 2016. During that period, Renewable segment revenues increased from $230 million in 2014 to $349 million in 2016.

166.    In connection with the spin-off announcement on June 20, 2015, the Company stated that "[w]e expect growth in the backlog since December 31, 2014, which relates primarily to recent international coal boiler and renewable bookings, will provide revenue growth in this segment."

**Materially False and Misleading Statements Issued During the Relevant Period**

167.    The Individual Defendants made, or caused to be made, materially false statements regarding the Company's growth and financial prospects as they pertained to the Renewable segment. During the Relevant Period, the Company touted its expertise in Renewable, while describing Renewable as its "key" growth platform, despite knowledge of ongoing, serious issues at several Renewable contract sites.

*June 17, 2017 Analyst/Investor Day*

168.    On June 17, 2017, the Company hosted an Analyst/Investor Day. At this time, the Individual Defendants either knew, or were reckless in failing to know, that significant piping design problems existed at Copenhill. Despite this knowledge, Defendant Ferland falsely reported B&W's engineering and design capabilities as a "core competency" in delivering on projects, stating:

> [W]e're a technology company, ***we do engineering and design, we're really good at both of those. Our customers value that and they're willing to pay us for it. We're really good at complex project management.*** We're good in getting better at strategic sourcing. . . . ***That's why I think we can command the margins, we commanded the market today*** and we can probably do better, right. Manufacturing, facility operation and on-site installation, that's a key part of delivering a complete project to a customer.

(Emphasis added.) Defendant Ferland further assured investors "we're going to make sure that we maintain that core competency [Engineering and Design] all the time."

169.    Defendant Ferland further cited the Company's European waste-to-energy projects as creating "a ton of momentum" there, adding "we're leveraging our technology, we're delivering a finished product quite often to the customer, and we're partnering where we need to." Defendant Ferland explained that "our job in the renewable waste-to-energy business is to leverage the success we've had in the U.K., which is great, and that's good for at least 2 or 3 years for us, to find the next market."

170.    Defendant Ferland noted that one of the Company's new waste-to-energy plants would "go through" TBWES, the Company's Indian joint venture, stating "[t]he India facility, I view it as an option, it's a great facility for us from a manufacturing cost standpoint and we can start to blend more and more of the Indian engineering into our work product, it's a nice combination."

171.    Defendant Ferland further noted cost-cutting and international growth initiatives that were a component of the Company's strategy, stating: "I really believe we can drive value via margin improvement, we've got our hands on the projects, we know what we need to do. You can already see the traction we have on revenue growth internationally. I feel really good about that piece of the strategy."

172.    The statements made at the June 17, 2017 Analyst/Investor Day presentation were materially false and misleading in that they failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the

effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting.

### *July 30, 2015 Prospectus*

173.    On June 30, 2015, as part of the Spin-off, the Company filed its final prospectus (the "Prospectus"). The Prospectus failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial

reporting. The Prospectus, however, instead discussed generally the future business and operations of B&W:

> Following the spin-off, we will be an independent, publicly traded company that operates the Company's Power Generation business. The Company will not retain any ownership interest in us.
>
> New B&W will be a leading technology-based provider of advanced fossil and renewable power generation equipment with a broad suite of boiler products and environmental systems. In addition, we will provide one of the most comprehensive platforms of aftermarket services to a large global installed base of power generation facilities. Finally, we will be a leading provider of technology and services in the growing market for industrial environmental systems. Across all our capabilities, we specialize in engineering, manufacturing, procurement, and erection of equipment and technology across a large and global customer base.
>
> New B&W will operate in three reportable segments: Global Power, Global Services and Industrial Environmental. Through our Global Power segment, we engineer, manufacture, procure, construct and commission steam generating and environmental systems and other related equipment. Through our Global Services segment, we provide a comprehensive mix of aftermarket products and services to support peak efficiency and availability of steam generating and associated environmental and auxiliary equipment. Our global installed base represents more than 300,000 MW of equivalent steam-generating capacity in more than 800 facilities in over 90 countries. We also provide aftermarket services for installed units delivered by other original equipment suppliers. Through our Industrial Environmental segment, we design, engineer and manufacture products including oxidizers, solvent and distillation systems, wet and dry electrostatic precipitators, scrubbers and heat recovery systems. This segment is comprised of the operations of MEGTEC Holdings, Inc. and its subsidiaries ("MEGTEC"), which we acquired on June 20, 2014.

174. The Prospectus additionally touted the Company's "competitive strengths" and positive prospects, particularly regarding its Global Power Segment, stating, in relevant part:

> We have a number of competitive strengths that we believe position us for continued success in our markets. They include:
>
> - Leading Market Position in the Global Power Generation Market: We are a proven leader and brand in the design, engineering, manufacture, supply, construction and maintenance of steam generating and environmental control systems for power generation providers worldwide.

\* \* \*

Our Global Power segment represents our worldwide new build boiler and environmental products businesses. Through this segment, we engineer, manufacture, procure, construct and commission steam generating and environmental systems and other related equipment. Our boilers are designed for utility and industrial applications, fired with fossil and renewable fuels and include advanced supercritical boilers, subcritical boilers, fluidized bed boilers, biomass-fired boilers, waste-to-energy boilers, chemical recovery boilers, industrial power boilers, package boilers, heat recovery steam generators, waste heat boilers and solar thermal power systems. Our environmental systems offer air pollution control products and related equipment for the treatment of nitrogen oxides, sulfur dioxide, fine particulate, mercury, acid gases and other hazardous air emissions and include wet and dry flue gas desulfurization systems, catalytic and non-catalytic nitrogen oxides reduction systems, low nitrogen oxides burners and overfire air systems, fabric filter baghouses, wet and dry electrostatic precipitators, mercury control systems and dry sorbent injection for acid gas mitigation. Our customers consist of a wide range of utilities, independent power producers and industrial companies globally. This segment's activity is dependent on the capital expenditures and operations and maintenance expenditures of global electric power generating companies and other steam-using industries with environmental compliance needs.

175.    In the Prospectus, the Company continued to tout its Global Power segment,

including the segment's prospects and "opportunities for growth," stating, in relevant part:

We see opportunities for growth in revenues in this segment relating to a variety of factors including the following:

- emerging international markets needing state-of-the-art technology for fossil power generation and environmental systems;

- a global need for renewable and carbon neutral power applications requiring steam generation and environmental control technologies to enable beneficial use of municipal waste and biomass;

- industrial products such as heat recovery and steam generators, and natural gas and oil fired package boilers due to lower fuel prices; and

- increasing environmental regulation.

Globally, efforts to reduce the environmental impact of burning fossil fuels may create opportunities for us as existing generating capacity is replaced with cleaner technologies. We are actively researching, developing and deploying a range of products to serve this opportunity, including lower-carbon technologies that

enable clean use of fossil fuels, such as ultra-supercritical boilers; carbon-neutral technologies, such as biomass-fueled boilers and gasifiers; gas-fired package boiler technologies; and select carbon dioxide capture technologies.

For the three months ended March 31, 2015, we generated revenues of $123.9 million in this segment. Revenues were approximately 12.3% higher than the $110.3 million generated for the three months ended March 31, 2014 as a result of higher new build steam generation systems revenues primarily related to recently awarded large boiler projects. For the year ended December 31, 2014, we generated revenues of $471.9 million in this segment. Revenues were substantially lower than the $712.5 million generated for the year ended December 31, 2013 as projects related to the previously enacted environmental rules and regulations neared completion. We expect the growth in backlog since December 31, 2014, which relates primarily to recent international coal boiler and renewable bookings, will provide revenue growth in this segment.

### August 4, 2015 Press Release

176.    On August 4, 2015, B&W issued a press release announcing financial results for the fiscal quarter ended June 30, 2015 and affirming its guidance for the fiscal year 2015 (the "8-4-15 Press Release"). The press release failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial

reporting. While failing to make these disclosures, the Company provided a summary of its

quarterly results, stating, in relevant part:

> Babcock & Wilcox Enterprises, Inc. (B&W) (NYSE:BW) announced today second quarter 2015 revenues of $437.5 million, an increase of $110.1 million, or 33.6%, from the second quarter of 2014. GAAP earnings per share from continuing operations for the second quarter of 2015 were $0.08 compared to $0.03 in the second quarter of 2014. Adjusted earnings per share, which excludes the impact of impairment, restructuring and spin-related costs for the quarter, were $0.27 for the three months ended June 30, 2015 compared to $0.14 in the prior year period.

> "As we begin operations as a stand-alone company, B&W continues to deliver on our strategy and build a solid track record of performance," said Mr. E. James Ferland, Chairman and Chief Executive Officer. "We are pleased that all three business segments ended the quarter at or above target with a significant increase in revenues in Global Power driven by the new international project awards in line with our growth strategy."

> In addition the Board has authorized a share repurchase program of up to $100 million over the next two years. "The new program will allow opportunistic share repurchases as part of our broader capital allocation strategy," continued Mr. Ferland.

177.    The 8-4-2015 Press Release additionally presented the Company's results of

operations for the quarter:

Results of Operations

Consolidated revenues for the second quarter of 2015 were $437.5 million, an increase of 33.6%, compared to $327.4 million for the second quarter of 2014. The Global Power segment had the largest increase with revenues of $157.4 million in the quarter, which was a 43.5% increase over the $109.7 million in revenues in the prior year period driven by an increase in new build steam projects. Revenues in the Global Services segment were $236.7 million in the three months ending June 30, 2015, versus $214.1 million in the corresponding period in 2014, an increase of $22.6 million primarily related to increased activity in service projects and construction. The Industrial Environmental segment contributed $43.4 million in revenue this period compared to $3.6 million in the second quarter of 2014 due to the acquisition of MEGTEC on June 20, 2014.

GAAP operating income for the second quarter of 2015 increased $1.7 million to $4.9 million compared to $3.2 million in the prior year period primarily due to increased revenues. GAAP operating income for the second quarter of 2015 also

included $9.0 million of non-cash facility and equipment impairments primarily related to the close-out of a carbon capture and storage research program, as well as $5.3 million of restructuring costs related to margin improvement and $0.9 million in spin-related costs. Excluding these charges and a $1.3 million allocation for the discontinued Nuclear Energy operation that was transferred to BWX Technologies as part of the spin, adjusted operating income increased 71% in the second quarter of 2015 to $21.4 million, compared to adjusted operating income of $12.5 million in the second quarter of 2014.

Second quarter 2015 gross profit in the Global Power segment increased $7.2 million from the same period last year to $26.7 million, attributable to the increased segment revenues. The Global Services segment reported a gross profit of $46.3 million in the second quarter of 2015, which was $2.0 million less than the gross profit of $48.4 million in the prior year second quarter due to the effects of operations and maintenance activities. Gross profit in the Industrial Environmental segment was $8.9 million in the second quarter of 2015 as a result of the MEGTEC acquisition.

"With the spin behind us, we will increase our focus on execution of our strategy to improve profitability and grow the company," continued Mr. Ferland. "We will continue to drive margins, expand globally and look for smart acquisitions. We have teams working each of the three elements of our strategy while our day-to-day operations work to exceed customer expectations."

### *August 4, 2015 Form 10-Q*

178.   On August 4, 2015, the Company filed a Form 10-Q with the SEC for the fiscal quarter ended June 30, 2015 (the "2Q 2015 10-Q"), signed by Defendant Hoehn. The 2Q 2015 10-Q failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key

projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting. Instead, the 2Q 2015 10-Q reiterated substantially the same financial results provided in the 8-4-2015 Press Release.

179.    The 2Q 2015 10-Q touted the Company's Renewable business growth strategy and backlog, stating, in relevant part:

> Globally, efforts to reduce the environmental impact of burning fossil fuels may create opportunities for us as existing generating capacity is replaced with cleaner technologies.

> * * *

> We expect the recent growth in backlog, which relates primarily to recent international coal boiler and renewable bookings, will provide revenue growth in this segment, although the rate of backlog growth is dependent on many external factors described above and may vary from period to period.

180.    Also, in a section titled "Backlog," the 2Q 2015 10-Q showed Global Power backlog increasing from $946 million on December 31, 2014 to $1.185 billion on June 30, 2015. The 2Q 2015 10-Q indicated that the Company expected to recognize $322 million in revenue from the Global Power backlog in 2015; $448 million in 2016; and $415 million thereafter.

181.    The 2Q 2015 10-Q also addressed certain cost cutting measures, stating: "[w]e are also targeting additional structural change initiatives that we expect . . . to drive further margin improvement in our Global Power and Global Services segments." Further, the filing noted that "cost savings from these programs are expected to make our offerings more cost-competitive through both direct and overhead cost reductions, allowing us to more aggressively pursue new business opportunities and other initiatives to increase stockholder value."

182.    Attached to the 2Q 2015 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Ferland and Apker attesting to the accuracy of the 2Q 2015 10-Q.

***August 5, 2015 Earnings Conference Call***

183.    On August 5, 2015, the Company held an earnings call concerning financial results for the quarter ended June 30, 2015. In the earnings conference call, Defendant Ferland failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting.

184.    During the call, Defendant Ferland stated that B&W's "global power division is our primary organic growth engine as we seek to expand our presence worldwide." Discussing Global Power, Defendant Ferland stated that "[w]e . . . feel good about the revenue outlook given the visibility of the backlog in this business through 2017." Defendant Ferland further noted that "we're in good position to generate growth as we slowly diversify the business to reduce our

dependence on US coal and leverage our core competencies and strong balance sheet to expand our presence in the growing renewables and industrial environmental segments."

185.   Defendant Ferland further commented on the bid pipeline, noting that it had remained steady in the range of $2.5 billion, stating that was "a pretty good sign that we booked an awful lot of large projects in the last nine months give or take . . . The new business development teams that we have in place working with our . . . operations folks continue to source good opportunities for us both on the renewable side . . . as we look to, you know, maybe continue our success in the -- in the UK and begin to expand our renewables business worldwide."

*September 21, 2015 Statements*

186.   On September 21, 2015, the Company announced the award of contracts for the Teesside Renewable Energy Plant in Middlesbrough, England. In the announcement, Scavuzzo, Senior Vice President of the Global Power division, bragged, "[w]ith more than 500 biomass and waste-to-energy units installed worldwide and O&M experience, *we bring unmatched capabilities* to this important project." The announcement asserted that project engineering for Teesside was underway, and completion was scheduled for the first quarter of 2018.

187.   The September 21, 2015 statements were false and misleading in that they failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to

meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting.

### *November 3, 2015 Press Release*

188.    On November 3, 2015, B&W issued a press release announcing financial results for the fiscal quarter ended September 30, 2015 and updating its guidance for the fiscal year 2015 (the "11-3-15 Press Release"). The press release failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting. While failing to make these disclosures, the Company provided a summary of its quarterly results, stating, in relevant part:

Babcock & Wilcox Enterprises, Inc. (B&W) (NYSE:BW) announced today third quarter 2015 revenues of $420.0 million, an increase of $18.0 million, or 4.5%, from the third quarter of 2014. GAAP earnings per share from continuing operations for the third quarter of 2015 were $0.11 compared to $0.24 in the third quarter of 2014. Adjusted earnings per share, which excludes the impact of a litigation settlement, spin-related costs and restructuring for the quarter, were $0.25 for the three months ended September 30, 2015 compared to $0.33 in the prior year period.

"Third quarter performance met our internal targets, as a strong quarter from Global Power allowed us to overcome a challenging project in Global Services," said Mr. E. James Ferland, Chairman and Chief Executive Officer. "We continue to expect strong performance in Q4 and we are raising the bottom end of our guidance for adjusted earnings per share by 5 cents to a range of $1.15 to $1.30."

189.    The 11-3-2015 Press Release additionally provided the Company's results of operations for the quarter:

Results of Operations

Consolidated revenues for the third quarter of 2015 were $420.0 million, an increase of 4.5%, compared to $402.0 million for the third quarter of 2014. GAAP operating income for the third quarter of 2015 decreased $15.9 million to $9.6 million compared to $25.5 million in the prior year period primarily due to lower profits in Global Services and the inclusion of stand-alone costs. GAAP operating income for the third quarter of 2015 also included a $9.6 million charge comprised of $7.8 million of non-cash revenue reversal plus $1.8 million of legal costs related to the litigation settlement for Berlin Station, in addition to $1.6 million in spin-related costs and $1.1 million of restructuring costs. Adjusted operating income in the third quarter of 2015 was $21.9 million, a decrease of $10.4 million compared to adjusted operating income of $32.3 million in the third quarter of 2014 primarily due to a loss accrual on a construction services project and increased overhead costs due to running a stand-alone company. Adjusted operating income for the nine months ended September 30, 2015, increased 23.5% compared to the prior year period.

Third quarter 2015 revenues for the Global Power segment increased 29.1% to $160.0 million in the quarter compared to $123.9 million in revenues in the prior year period driven by an increase in new build steam projects that was partially offset by a decline in new build environmental projects. Gross profit in the Global Power segment was $25.8 million, compared to $29.7 million for the same period in 2014. Without the Berlin settlement, gross profit in Global Power was up for the quarter compared to the third quarter of 2014.

"Although we remained confident in our case, by settling the Berlin Station litigation, we avoided potential draws on our letters of credit, significant management distraction and the inherent uncertainty of collecting on any favorable court decisions years in the future," Mr. Ferland said.

190. Defendant Ferland also touted the prospects of the Company, stating, "We continued to execute our strategy to drive shareholder value through revenue growth and margin improvement in the core businesses in the quarter . . . We are also making progress on our plans to grow the business through value-added acquisitions and the number of M&A opportunities that we are evaluating continues to rise."

**_November 3, 2015 Form 10-Q_**

191. On November 3, 2015, the Company filed a Form 10-Q with the SEC for the fiscal quarter ended September 30, 2015 (the "3Q 2015 10-Q"), signed by Defendant Hoehn. The 3Q 2015 10-Q failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial

reporting. Instead, the 3Q 2015 10-Q reiterated substantially the same financial results provided in the 11-3-2015 Press Release.

192.    In a section titled "Backlog," the 3Q 2015 10-Q showed an increase in the global power backlog from $946 million on December 31, 2014 to $1.253 billion on September 30, 2015. It further stated that the Company expected to recognize revenue of $175 million from the Global Power backlog in 2015, $519 million in 2016, and $559 million "thereafter."

193.    Attached to the 3Q 2015 10-Q were SOX certifications signed by Defendants Ferland and Apker attesting to its accuracy.

***November 4, 2015 Earnings Conference Call***

194.    The Company held an earnings call regarding its financial results for the quarter ended September 30, 2015. In the earnings conference call, Defendants Ferland and Apker failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting.

195.    During the call, Defendant Ferland continued to tout the "strong performance in Global Power, stating "Global Power's awards, including the new waste energy plant announced this quarter, are keeping the backlog high."

196.    Defendant Apker concurred, stating that the "Global Power segment again posted strong revenue growth . . . due to the strength in both utility and renewable boilers businesses."

197.    Defendant Ferland championed the "continuing success of our efforts to grow revenue, primarily in Global Power," stating that "[w]e're confident that our expanding backlog in Global Power and continued focus on margin improvement will generate significant core growth in 2016."

198.    Defendant Ferland elaborated on the growth in the Renewable segment during the question and answer session, stating: "Global Power, in particular the waste-to-energy project in Europe, right, we have several projects we've signed. We are just—we are in the process of ramping up revenues right now that's going to continue into 2016, and our bid pipeline is actually up, not down."

199.    Defendant Ferland further explained that the Company functions as an original equipment manufacturer in waste-to-energy projects and that the Company partners with outside construction companies to build the plants. He described the Teesside project as "a very traditional work scope for us. We stick to our knitting. We do what we're good at and we find a partner who knows how to do construction and they do what they are good at. We've had good success in not only booking that work but executing that work."

200.    Responding to questions from analysts about B&Ws bid pipeline, Ferland stated, in part:

> [O]ur bid pipeline remains strong. As a matter of fact, it's actually growing despite the fact that we continue to sign these large projects, at which time they

come off our bid pipeline. We're getting some traction on both fronts. We continue to see waste energy opportunities currently in Europe

* * *

So, we may find one or two opportunities that we like and that we'd be willing to sign in 2016. So, again, we feel good about revenue growth, the bid pipeline is strong, and we would expect some more success in 2016.

201.    Analysts relied on Defendants' materially false and misleading statements. For example, an analyst with William Blair noted "limited downside risk (especially on revenue) given the company's solid backlog" and Credit Suisse referenced management's comments on Global Power as the "primary organic growth engine for the Company" and stated that the Company's backlog provided "good visibility" through 2017.

### February 25, 2016 Press Release

202.    On February 25, 2016, B&W issued a press release announcing financial results for the fiscal quarter and year ended December 31, 2015 and provided guidance for the fiscal year 2016 (the "2-25-16 Press Release"). The press release failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its

business, operations, and prospects were misleadingly positive; and (6) the Company lacked

effective internal controls over financial reporting. While failing to make these disclosures, the

Company provided a summary of its quarterly results, noting that they were "strong," stating, in

relevant part:

> Babcock & Wilcox Enterprises, Inc. (B&W) (NYSE:BW) announced today fourth quarter 2015 revenues of $502.7 million, an increase of $58.1 million, or 13.1%, from the fourth quarter of 2014. GAAP earnings per share for the fourth quarter of 2015 were a loss of $0.10 compared to a loss of $0.90 in the fourth quarter of 2014. Adjusted earnings per share were $0.47 for the three months ended December 31, 2015compared to $0.66 in the prior year period. Adjusted earnings per share excludes the impact of non-cash mark-to-market adjustments for pension and other post-retirement benefits, impairments, restructuring and other costs as shown in Exhibit 1.

> "B&W ended the year with a strong quarter led by the continued growth in Global Power," said Mr. E. James Ferland, Chairman and Chief Executive Officer. "Revenue, gross profit, operating income and free cash flow were all improved in the quarter compared to the prior year fourth quarter, providing a strong finish to a solid year."

> 203.    The 2-25-16 Press Release additionally provided the Company's full year 2016

outlook, noting, in relevant part:

> 2016 will be B&W's first full year as a stand-alone company. Guidance for key financial benchmarks in 2016 includes:

> Revenue is expected to increase to $1.8 billion based on mid-single digit growth in our Global Power and Industrial Environmental business units while Global Services is expected to remain flat;

> Full year adjusted EPS in the range of $1.25 to $1.45;

> Adjusted tax rate for 2016 is expected to be in the range of 31%-33%;

> Earnings are expected to start low in the first quarter and improve through the year due to project timing;

> EPS estimates exclude any mark-to-market adjustment for pension and post-retirement benefits or restructuring charges;

Free cash flow conversion is expected to be between 75% and 100% of net income; and

This guidance does not include incremental benefit from acquisitions or additional share repurchases beyond our initial share repurchase program that is expected to conclude by the end of the first quarter 2016.

204.   Defendant Ferland touted the Company's prospects in 2016, stating:

Through a combination of revenue growth driven by our strong backlog and robust bid pipeline, continued margin improvement and share buybacks through February 2016, we are projecting 12% adjusted EPS growth in 2016, relative to our original adjusted EPS guidance for 2015. . . . This guidance reflects some pressure on merchant utility spending from continued low natural gas prices, foreign exchange headwinds and a challenging global industrial market. We are confident that we will provide meaningful growth to our core business in 2016, while continuing to leverage our strong balance sheet to pursue acquisitions and/or additional share repurchases.

### *February 25, 2016 Form 10-K*

205.   On February 25, 2016, the Company filed a Form 10-K with the SEC for the fiscal year ended December 31, 2015 (the "2015 10-K"), signed by Defendants Ferland, Apker, Hoehn, Christopher, Dubin, Ferraioli, Hanks, Pramaggiore, and Weyers. The 2015 10-K failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's

presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting. Instead, the 2015 10-K reiterated substantially the same financial results provided in the 2-25-2016 Press Release.

206.     In a section titled "Backlog" the 2015 10-K showed an increase in Global Power backlog from $946 million on December 31, 2014 to $1.118 billion on December 31, 2015. It stated that the Company expected to recognize revenue from the Global Power backlog of $548 million in 2016, $229 million in 2017, and $341 million thereafter.

207.     Attached to the 2015 10-K were SOX certifications signed by Defendants Ferland and Apker attesting to its accuracy.

### February 26, 2016 Earnings Conference Call

208.     The Company hosted an earnings conference call regarding its earnings for the quarter and year ended December 31, 2015. In the earnings conference call, Defendant Ferland failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's

presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting.

209.    During the call, Defendant Ferland stated that "our backlog remains strong at $2.3 billion. We were also pleased to see our bid pipeline grow approximately $200 million in the last quarter to $2.9 billion. This combination gives us confidence in our workload for 2016."

210.    Defendant Ferland further touted the Company's shift toward European renewable projects as follows:

> Our strategy to grow internationally continues to deliver. Our Global Power segment has transitioned from projects primarily focused on adding new environmental controls equipment to existing coal plants in the US to a portfolio dominated by new renewable waste energy plants being built in the European marketplace. Last month we announced our sixth contract to build a new renewable waste energy plant in the UK just after successfully completely our first unit at Peterborough in England at the end of 2015.

> While the UK is an important market for us, the investment in our International Business Development team is helping us to reach other markets that are poised to build renewable waste to energy plants in the next few years, as well as opportunities to sell and service additional coal-fired power plants and environmental equipment. We are working on technical qualifications and developing relationships with partners to be ready when the opportunities emerge.

211.    With respect to growing the Renewable segment, Defendant Ferland stated: "our primary focus is organically expanding beyond Northern Europe, primarily the UK, and we are making some progress. We've made significant investments on the business development side. We're doing a good job of lining up partners and tracking specific projects." As a result of their efforts, Defendant Ferland said, "we've announced one—it was a UK project—a couple weeks ago. We would expect the rest of these opportunities to manifest themselves over the next six to 18 months."

212.    With respect to revenue growth in Global Power, Ferland stated:

> Global Power, it remains strong for us. We're projecting about a 5% growth year-over-year. We know bookings were a little light in Q4 in the Global Power

division. We've told folks those are going to be up and down and you can see that we announced early in 2015 another $90 million waste-to-energy plant win. So we feel pretty good about Global Power.

213. Defendant Ferland additionally noted that because these are "two-to-three year projects," an increase in backlog in 2015 translates into revenue from approximately 2016 through 2018.

214. Regarding changes in profit margins on renewable energy projects, Defendant Ferland explained:

> Waste energy projects, over two to three years, from a margin perspective, they're going to tend to start off light—some of it's upfront engineering and procurement—and then we get into the actual on-site work. Just by the nature of those projects, the margins will be lower upfront. As we reach major milestones, or perhaps actually complete projects, that allows us to free up contingency that we had not been taking to the bottom line. So on the bulk of those larger projects, it starts slow, and assuming we do a good job, which we do on most of them, finish strong from a margin perspective.

### The 2016 Proxy Statement

215. On March 25, 2016, the Company filed the 2016 Proxy Statement, which failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's

presentation of its business, operations, and prospects were misleadingly positive; and (6) the

Company lacked effective internal controls over financial reporting. Instead, the 2016 Proxy

Statement touted the Company's outstanding performance in 2015, stating, in relevant part:

> B&W began operations on July 1, 2015 with a clear strategy and strong foundation on which to grow earnings and create value for the stockholders of our new company. The strength of the B&W team was evident in our outstanding performance in 2015. Despite an extremely challenging utility market, we demonstrated our ability to perform, exceeding earnings per share and free cash flow targets, and building a strong backlog as we executed our strategy for the future.

216.    The 2016 Proxy Statement also provided B&W's plans for growth, stating, in

relevant part:

> B&W exited the spin-off poised for growth with:
>
> - A strong leadership team
>
> - Zero debt
>
> - A balance sheet with more than $300 million in cash

217.    Additionally, the 2016 Proxy statement noted, "Corporate governance is an

important responsibility at B&W. Our governance policies and structures build trust with our

stockholders. They provide a strong framework and assurance that we are clear, ethical and

transparent in all of our business dealings." Moreover, the 2016 Proxy Statement stated that the

Company's governance policies and structures "help [B&W] operate more effectively, mitigate

risk and act as a safeguard against mismanagement."  These statements were specifically false

and misleading due to the omissions referenced herein and the Individual Defendants' failures to

abide by the requirements of the Code of Ethics and Code of Conduct, which were also

referenced in the 2016 Proxy Statement.

### *May 10, 2016 Press Release*

218.   On May 10, 2016, the Company issued a press release announcing financial results for the fiscal quarter ended March 31, 2016 and reaffirmed its guidance for 2016 (the "5-10-16 Press Release").   The 5-10-16 Press Release failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting. While failing to make these disclosures, the Company provided a summary of its quarterly results, stating, in relevant part:

> Babcock & Wilcox Enterprises, Inc. (B&W) (NYSE:BW) announced today first quarter 2016 revenues of $404.1 million, an increase of $7.0 million, or 1.8%, from the first quarter of 2015. GAAP earnings per share for the first quarter of 2016 were $0.20 compared to $0.21 in the first quarter of 2015. Adjusted earnings per share, which excludes the impact of spin-off transaction costs and restructuring for the quarter, were $0.27 for the three months ended March 31, 2016 compared to $0.26 in the prior year period.

> "First quarter performance exceeded our internal projections and provided a solid start to 2016," said Mr. E. James Ferland, Chairman and Chief Executive Officer. "Strong performance in Global Power is expected to offset challenges in Industrial Environmental throughout the year as the soft climate for U.S. industrial markets persists in the near-term. We are reaffirming our 2016 guidance range of $1.25 to $1.45 adjusted EPS."

219.    The 5-10-16 Press Release additionally provided the Company's results of operations for the quarter, stating, in relevant part:

Results of Operations

Consolidated revenues for the first quarter of 2016 were $404.1 million, an increase of 1.8%, compared to $397.2 million for the first quarter of 2015 due to increased revenues in Global Power and Global Services more than offsetting a decrease in Industrial Environmental revenues. GAAP operating income for the first quarter of 2016 and 2015 was $17.3 million in both years even with approximately $3.0 million of additional costs as a stand-alone company in the 2016 period. In the first quarter 2016, strong performance in Global Power and improved equity income from our Asian joint ventures offset an unfavorable revenue mix in Global Services and slower sales in Industrial Environmental. Adjusted operating income in the first quarter of 2016 was $21.3 million, an increase of $0.2 million, compared to adjusted operating income of $21.1 million in the first quarter of 2015.

First quarter 2016 revenues for the Global Power segment increased 5.3% to $130.5 million in the quarter compared to $123.9 million in revenues in the prior year period driven by an increase in new build steam projects that was partially offset by a decline in new build environmental projects. Gross profit in the Global Power segment was $24.4 million, a 19.3% increase compared to $20.4 million for the same period in 2015 due to increased volume and a higher amount of net project improvements from favorable milestone achievements.

### May 10, 2016 Form 10-Q

220.    On May 10, 2016, the Company filed a Form 10-Q with the SEC for the fiscal quarter ended March 31, 2016 (the "1Q 2016 10-Q"), signed by Defendant Hoehn. The 1Q 2016 10-Q failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management

processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting. Instead, the 1Q 2016 10-Q reiterated substantially the same financial results provided in the 5-10-2016 Press Release.

221.    In a section titled "Backlog," the 1Q 2016 10-Q showed a backlog of $1.184 billion in Global Power on March 31, 2016. The 1Q 2016 10-Q noted that the Company expected to recognize revenue from the Global Power backlog of $461 million in 2016, $302 million in 2017, and $421 million thereafter.

222.    Attached to the 1Q 2016 10-Q were SOX certifications signed by Defendants Ferland and Apker attesting to its accuracy.

### May 11, 2016 Earnings Conference Call

223.    The Company hosted an earnings conference call regarding its financial results for the quarter ended March 31, 2016 on May 11, 2016. In the earnings conference call, Defendants Ferland and Apker failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project

management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting.

224.     During the call, Defendant Ferland continued to harp on the alleged strength of Global Power, noting that it "had a good quarter with a 19% increase in gross profit that was driven by higher volume and upside provided from a couple of well-executed projects that are nearing completion." Defendant Ferland summarized the expectations for the year, stating "we're confident that Global Power will step up to cover the shortfall," and that "[w]e believe Global Power has enough upside to cover the soft industrial market that is affecting the Industrial Environmental business."

225.     Defendant Ferland also stated:

In reviewing our strategic priorities, our margin improvement program remains on track to deliver $15 million of savings in 2016 and again in 2017. Our efforts to pursue core growth internationally are also gaining traction as our Business Development team is finding opportunities in international markets and expanding our reach. We've been working on both of these initiatives long before the spin and are pleased to see them making progress consistent with our plans.

226.     Defendant Apker also noted that Global Power increased gross profit, "led by the several renewables projects as well as the recognition of project improvements associated with a couple of projects nearing completion."

227.     Defendant Ferland also asserted that growth was expected in the Global Power pipeline and B&W Volund projects, stating:

[T]he overall pipeline remains strong for us. We would expect to book one to two additional large projects in Global Power, beyond the two we've already

announced, in 2016. We continue to see opportunities in Europe which is where we've had an awful lot of success the last couple of years. I will tell you that we continue to see a growing number of opportunities around the world that they just take time to develop. We have good folks tracking multiple opportunities. We have a great technology and a great product to bring to the marketplace and a very good name in Volund backed by B&W.

228.    Defendant Ferland also explained expectations in the Global Power segment had not changed, stating:

> Global Power, that business remains a strength for us. We continue to see an increasing number of opportunities and we continue to perform well on the projects, so I don't think that's any different from last year. We feel good about it today, just about like we did in the past.

229.    Defendant Ferland explained that Global Power revenue performance had exceeded internal expectations, stating: "We had a couple of projects we've been performing very well on, which is great, but we figured the upside opportunities for those projects would be more in Q2, and it moved back into Q1."

**The Truth Begins to Emerge, Yet the Company Continues to Conceal the True Extent of the Fraud**

*June 28, 2016 Press Release*

230.    On June 28, 2016, B&W issued a press release announcing that the Company would be restructuring its traditional power business and would significantly be reducing its guidance for 2016 (the "6-28-16 Press Release"). Moreover, the 6-28-16 Press Release revealed that a project in B&W's European renewable business had problems. Nonetheless, the 6-28-16 Press Release failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance

and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting. Instead, the 6-28-16 Press Release commented on its updated guidance for 2016, stating, in relevant part:

> Babcock & Wilcox Enterprises, Inc. (B&W) (NYSE:BW) today announced actions to proactively restructure its traditional power business in advance of a lower projection for U.S. coal generation and has updated guidance for 2016 to reflect:
> The net impact of the restructuring and decreased coal-related revenue in the second half of 2016.
>
> A charge to correct an engineering design error on a new build renewable energy plant in Europe. The resulting re-engineering, on-site rework and delivery delay will result in a $32 million pretax charge in the quarter and a full-year ($0.51) EPS impact.
>
> The shift of $38 million in 2016 expected revenue from a Canadian oil sands project that was delayed due to the impact of the Fort McMurray fires.
> Revised earnings guidance for adjusted EPS is now $0.63 to $0.83, primarily due to the effects of the renewable energy project and the timing shift of the Canadian oil sands project. The restructuring savings largely offset the impact of expected lower coal-related revenue. Revenue guidance remains unchanged at $1.8 billion as the incremental revenue from the SPIG acquisition, which is anticipated to close early in Q3, is expected to approximately offset the other revenue impacts. B&W will webcast a discussion of this announcement on Tuesday, June 28, 2016 at 9:00 a.m. ET.

231. With regard to the Company's restructuring of its traditional power business, the Company noted that its traditional power business that serves coal-fired power generation was being restructured to reduce overhead and improve efficiency in response to projections that coal

utilization will decline faster than previously forecast. The 6-28-16 Press Release stated, in relevant part:

> Traditional Power Business Restructuring
>
> B&W is restructuring its traditional power business that serves coal-fired power generation to reduce overhead and improve efficiency in response to projections that coal utilization, particularly in the U.S., will decline faster than previously forecast. The new organizational structure includes a redesign of workflow for its North American-based coal power generation resources to provide an effective, flexible organization that can adapt to the changing market conditions.
>
> As part of these changes, B&W will eliminate over 200 positions in North America immediately and undertake other cost-savings measures across the enterprise. The company also expects additional facility consolidations in the coming year. Severance expenses and other costs over the next 12 months will be approximately $55 to $60 million, of which approximately $30 million are non-cash and include the write-down of B&W's one coal power plant and deferred tax assets related to the India manufacturing joint venture and various state net operating loss carryforwards. These savings are expected to allow the coal business to hold gross margins constant in the coming years despite the expected decline in volume.
>
> B&W is consolidating aftermarket and global new build activities for coal-fired generation into one segment that will be led by Mark Low, Senior Vice President of the new Power segment. All renewable energy projects, including the B&W Vølund subsidiary, will be consolidated into another segment, led by Paul Scavuzzo, Senior Vice President of the new Renewable segment. This new structure will allow for a Power segment focus on efficiency and support for our traditional customer base while the Renewable segment focuses solely on renewable project execution and worldwide growth.
>
> "We have reduced the size of our organization that supports the coal market by roughly 20% and restructured how we support this market," said E. James Ferland, Chairman and Chief Executive Officer. "These changes will allow us to continue to provide outstanding service to our customers and maintain solid profit margins in our power business despite an expected 15-20% reduction in U.S. coal customers' demand for our parts and services by 2017 or 2018."

232.    The 6-28-16 Press Release also noted a deficiency in the piping design of one of the Company's renewable waste to energy projects, stating, in relevant part:

> European Renewable Energy Project

During construction, B&W self-discovered a deficiency in the piping design of one of our renewable waste to energy projects. The correction requires engineering and then physical rework. B&W is working closely with our customer to minimize any delays and ensure the delivery of a high-quality facility that meets or exceeds all performance guarantees. "Our B&W Vølund subsidiary has completed 25 projects in the last ten years," said Ferland. "Of those projects, 23 out of 25 were profitable, and significant project improvements were achieved due to good execution. We believe this is an isolated issue and have performed reviews to ensure this piping design issue is not present in the other projects."

233.    In the 6-28-16 Press Release, Defendant Ferland commented positively on the

Company's overall strategy, stating, in relevant part:

B&W remains focused on executing our strategy . . . . We are taking early action to ensure the coal-related business remains profitable in a challenging market while we grow our renewable energy business and diversify our portfolio through acquisition. We expect to close the SPIG acquisition early in the third quarter and continue to believe the revenue synergies for our combined businesses will provide significant upside. In addition, we plan to leverage our strong balance sheet and focus on diversification which we believe will provide increased value for our investors.

***June 28, 2017 Investor Call***

234.    The Company held an investor call on June 28, 2016 regarding the press release.

In the investor call, Defendant Ferland failed to disclose: (1) issues with B&W's Renewable

Segment Business, including schedule and productivity issues for projects, a lack of resources in

engineering and project management groups, and problematic on-site project management,

resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the

effect such issues were having on B&W's costs to complete projects, which resulted in declining

financial performance and decreased profit margins, and thus negatively impacted B&W's

financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project

management processes in its Renewable Segment Business, negatively impacting B&W's

performance on key projects from the bidding stage through execution; (4) B&W understated its

costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that,

as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting.

235.   During the call, Defendant Ferland stated that the renewable project was "roughly three-quarters complete" when the piping and design issues were discovered. He further assured investors that: "We've augmented the project management resources to ensure that this project is completed per the new schedule and cost estimate."

236.   Defendant Ferland repeatedly represented that the problem was "isolated," characterizing it as a "single project issue." He provided the following details:

> We're disappointed as well in what we believe is a single project issue in Vølund. So, the project in question is scheduled to complete very late this year, very early next year, so there's only a few months left on the project. Let me give you a little bit of background, both as to what happened and as to why we think this is an isolated issue.
>
> It is a piping design issue. That is normally a core competence of ours. This is right in our normal zone where we execute very well. In this particular case, the piping engineering design, and in particular, some of the backup calculations inside that design were incorrect. We did not discover that until very late in the process. Normally, we have sequential reviews that take place on those engineering designs, and for some reason on this one particular project those design reviews did not take place. I would say that our discovery process of this error was somewhat slow as well. We discovered it in pieces and it took us some time to step back and realize that the engineering design just needed to be redone.
>
> The reason the end result is such a large number is that the plant is essentially built and we're having to go back in, re-complete engineering, change piping design, change some steel around in order to facilitate the new engineering design, and at this stage in construction, that is not an easy thing to do. All that said, again, in regard to this particular project, we have obviously changed the Delivery Team. We have supplemented the project management resources, including some very talented resources out of the United States, and Jenny and I have spent significant time over there with the Team and in the plant and believe we can complete this project within the current budget and schedule. Having the same experience that you have had where these problems can linger on, we've done everything we can do to put our arms around this one and we believe we have a schedule and a cost estimate we can deliver on.

So, Part B of that question in regard to the isolated nature of this, we have taken a look at all of the other Renewable Energy projects we have in Europe, including the larger projects that are just kicking off in the UK, and we have looked at the engineering process and the engineering output, even though these projects are much earlier in process, and we do believe that this is an isolated issue.

* * *

We expect the one problem project in Vølund to be complete and Vølund to be back on track with a pretty strong year. Despite what will be some headwinds in the US coal aftermarket business, we think our proactive restructuring will allow us to hold gross margins constant in that business, even at a slightly reduced revenue number in '17. So on the whole, we think '17 will be a little bit better than the original '16 guidance today.

237.    Concerning the steps to be taken to improve operations and execution, Defendant

Ferland stated:

We've augmented the project management resources to ensure that this project is completed per the new schedule and cost estimate. We have also reviewed our other projects and believe this is an isolated issue and that the other projects do not have similar piping design challenges. Our Renewable Energy business and our B&W Vølund subsidiary has a solid track record with 25 major project completions in the last 10 years. Of those 25 projects, only two had minor losses, and as a group, they've delivered considerable upside through strong project execution.

* * *

[E]xecution issues, particularly of this magnitude, are unacceptable. So there are a couple off the bat. Number one, the way we've restructured the business as a result of the changes we're making today, on the Renewable side, the Renewable business will be a pure Renewable business and Paul Scavuzzo, for example, will no longer be distracted with some of the New Coal Build in Asia. His sole focus is on the Renewable business, and his primary job is on execution, right; and then secondary job is supporting the business development efforts going forward.

So there's one change. We recognize that there's challenge inherent in the significant growth of the Renewable business over the last couple of years and we need to better focus Management on execution. We've also, not surprisingly, as a result of the Vølund problems, made some changes in the Management Team and Vølund as well that we think will enhance our project management execution.

Second . . . as a part of the restructuring today, we've also—we've taken the Construction business and we've elevated it to the B&W level as opposed to being positioned inside the Power business, right. That allows increased focus on project execution. It allows us also to take the improved project execution process

that we've put into the Construction business, and spread it across the Company around the world.

So, we recognize that project execution challenges, in particular of this magnitude, are not acceptable, and it's my belief we're taking the actions we need to make sure that does not happen again.

238.    Defendant Ferland downplayed any further risk in the timing of completing the problem project:

[W]e've obviously gone in and put together a highly scrutinized new schedule and cost estimate, which we believe is achievable. We also have contingency in the event that moves around a little bit, and the contingency would include items like increased cost, directly increased cost from the schedule moving out, and any potential exposure to the customer as a result of the shifting end dates. So I think we have a solid budget and schedule and I think we have a little bit of contingency built in, in case we have a couple of challenges.

239.    Responding to a question regarding whether the Company performed all of the pipe engineering on the Vølund project and whether the same design was used in other Renewable projects, Defendant Ferland asserted that "each is somewhat unique but this is an engineering competency that we have and then we supplement the resources on a project by project basis." Defendant Ferland assured investors that when outside resources are used, "we remain in control of oversight and management on all that work."

240.    Due to this news, the price per share of B&W stock fell $4.02, or over 21.2%, from its previous day closing price to close at $14.92 on June 28, 2016.

### *August 9, 2016 Press Release*

241.    On August 9, 2016, the Company issued a press release announcing financial results for the fiscal quarter ended June 30, 2016 and reaffirmed its guidance for 2016 (the "8-9-16 Press Release"). The 8-9-16 Press Release failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project

management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting. While failing to make these disclosures, the Company provided a summary of its quarterly results, stating, in relevant part:

> Babcock & Wilcox Enterprises, Inc. (B&W) (NYSE:BW) announced today second quarter 2016 revenues of $383.2 million, a decrease of $54.3 million, or 12%, compared to the second quarter of 2015. The GAAP loss per share for the second quarter of 2016 was $(1.25) compared to earnings per share of $0.08 for the second quarter of 2015. Our adjusted loss per share, which excludes non-cash mark-to-market adjustments for pension and other post-retirement benefits as well as the impacts of restructuring activities, acquisition and integration costs, and spin-off transaction costs, was $(0.20) for the three months ended June 30, 2016 compared to adjusted earnings per share of $0.27 in the prior year period.

> "Although the previously announced isolated issue on a European renewable energy contract is weighing on this quarter's adjusted results, our recent acquisition, continued focus on international market development, and proactive restructuring of the U.S. power business have set us up for much improved results in 2017," said Mr. E. James Ferland, Chairman and Chief Executive Officer.

242.    The 8-9-16 Press Release additionally provided the Company's results of operations for the quarter, stating, in relevant part:

> Consolidated revenues for the second quarter of 2016 were $383.2 million, a decrease of 12%, compared to $437.5 million for the second quarter of 2015, due primarily to $26.4 million lower revenue related to a change in the estimated cost to complete a European renewable energy contract and decreases in volumes in

our Global Services and Industrial Environmental segments. The GAAP operating loss for the second quarter of 2016 was $72.6 million as compared to operating income of $4.9 million in the second quarter of 2015. The decrease was driven by a $31.7 million change in the estimated cost to complete a European renewable energy contract, a $29.9 million non-cash mark-to-market adjustment for pension and other post-retirements benefits and $31.6 million of restructuring activity and spin-off transaction costs. The adjusted operating loss in the second quarter of 2016 was $9.1 million, a decrease of $30.5 million compared to adjusted operating income of $21.4 million in the second quarter of 2015, which is primarily related to a charge on a European renewable energy contract.

Second quarter 2016 revenues for the Global Power segment decreased 19% to $127.2 million in the quarter compared to $157.4 million in revenues in the prior year period. Gross profit (loss) in the Global Power segment was $(9.1) million, compared to $26.7 million in the prior year period. Both changes were primarily due to a charge on a European renewable energy contract.

243.   The Company also commented on its 2016 Outlook and reaffirmed its revenue guidance, stating, in relevant part:

2016 Outlook

The Company reaffirms its revenue guidance of $1.8 billion and adjusted EPS guidance of $0.63 to $0.83. Adjusted EPS excludes mark-to-market adjustments for pension and other post-retirement benefits as well as the impact of restructuring activities, acquisition and integration costs, and spin-off transaction costs. As more fully described in Exhibit 1, Management is unable to reconcile without unreasonable effort the Company's forecasted range of adjusted EPS for the full year to a comparable GAAP range.

***August 9, 2016 Form 10-Q***

244.   On August 9, 2016, the Company filed a Form 10-Q with the SEC for the fiscal quarter ended June 30, 2016 (the "2Q 2016 10-Q"), signed by Defendant Hoehn. The 2Q 2016 10-Q failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance

and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting. Instead, the 2Q 2016 10-Q reiterated substantially the same financial results provided in the 8-9-2016 Press Release.

245.    The 2Q 2016 10-Q described the financial impact of the Renewable project problem:

> During the quarter ended June 30, 2016, we recorded a $31.7 million charge related to a change in estimate of the forecasted cost to complete a Global Power renewable energy contract in Europe that adversely affected revenue by $26.4 million during the quarter, including the reversal of $6.8 million of revenue that had been recognized through the first quarter of 2016. Management has concluded the second quarter change in estimate is a result of a deficiency in the piping design detected in late May 2016. This contract became a loss contract during the three months ended June 30, 2016. The project is approximately 73% complete as of June 30, 2016, and B&W's performance on this contract is expected to be completed by early 2017. The $6.4 million reserve for the estimated loss on this uncompleted contract is included in other accrued liabilities on our condensed consolidated and combined balance sheet at June 30, 2016.

246.    Additionally, in a section titled "Backlog," the 2Q 2016 10-Q noted a Global Power backlog of $1.094 billion as of June 30, 2016. It further noted that the Company expected to recognize revenue from the Renewable backlog of $361 million in 2016, $332 million in 2017, and $401 thereafter.

247.    Attached to the 2Q 2016 10-Q were SOX certifications signed by Defendants Ferland and Apker attesting to its accuracy.

*August 10, 2016 Earnings Conference Call*

248.     The Company held an investor conference call on August 10, 2016 regarding its results for the quarter ended June 30, 2016. In the earnings conference call, Defendant Ferland failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting.

249.     During the call, Defendant Ferland assured that "[w]e continue to closely monitor the challenged project and are encouraged that recovery efforts remain on-track for completion of this project early next year. In addition, we reviewed our projects in the UK and have determined that they do not have a piping design issue.

250.     Following the August releases, one analyst commented that "[p]ast project performance does not suggest all of BW's waste-to-energy projects will have losses . . . we do not expect [B&W] to record any further charges on other waste-to-energy projects."

*November 2, 2016 Press Release*

251.     On November 2, 2016, the Company issued a press release announcing financial results for the fiscal quarter ended September 30, 2016 and reduced its guidance for 2016 (the "11-2-16 Press Release"). The 11-2-16 Press Release failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting. While failing to make these disclosures, the Company provided a summary of its quarterly results, stating, in relevant part:

> Babcock & Wilcox Enterprises, Inc. (B&W) (NYSE:BW) announced today third quarter 2016 revenues of $411.0 million, a decrease of $9.0 million, or 2.1%, compared to the third quarter of 2015. The GAAP earnings per share for the third quarter of 2016 was $0.18 compared to earnings per share of $0.11 for the third quarter of 2015. Our adjusted earnings per share, which excludes restructuring activities, acquisition and integration costs, non-cash mark-to-market adjustments for pension and other post-retirement benefits, and spin-off transaction costs, was $0.24 for the three months ended September 30, 2016 compared to adjusted earnings per share of $0.25 in the prior year period.
>
> "We remain on track to achieve our forecasted results in 2016 despite some reluctance on the part of our power customers to invest, and continue to expect strength moving into 2017 as we remain focused on revenue diversification,

margin improvement and excellence in project execution," said Mr. E. James Ferland, Chairman and Chief Executive Officer.

252.    The 11-2-16 Press Release additionally provided the Company's results of operations for the quarter, stating, in relevant part:

Consolidated revenues for the third quarter of 2016 were $411.0 million, a decrease of $9.0 million, compared to $420.0 million for the third quarter of 2015, due primarily to decreased volume in our Power segment partially offset by an increase in revenues from our Renewable segment and contributions from newly acquired B&W SPIG within our Industrial segment. The GAAP operating income for the third quarter of 2016 was $11.1 million as compared to operating income of $9.6 million in the third quarter of 2015. The adjusted operating income in the third quarter of 2016 was $15.0 million, a decrease of $6.9 million compared to adjusted operating income of $21.9 million in the third quarter of 2015, due to lower volume in our Power segment and accelerated intangible amortization expense related to the acquisition of B&W SPIG, partially offset by higher gross profit margin in the Power segment and reductions in overhead costs.

Third quarter 2016 revenues for the Power segment decreased 29% to $209.8 million compared to $294.2 million in revenues in the prior year period. Revenues decreased as a result of lower oil sands work in Canada and lower power plant retrofit activity. Gross profit in the Power segment in the third quarter 2016 was $48.9 million, compared to $47.6 million in the prior year period. Gross profit margin improved year over year as a result of good project performance and benefits from our restructuring activities in the third quarter of 2016, while a litigation settlement and a contract loss impacted the third quarter of 2015.

Revenues in the Renewable segment were $124.3 million for the third quarter of 2016, versus $86.9 million in the corresponding period in 2015, an increase of $37.4 million driven by an increased level of activity on our renewable energy contracts compared to the prior year. The Renewable segment gross profit of $18.6 million in the third quarter of 2016 was $1.1 million higher than the $17.5 million gross profit reported in the prior year third quarter due to the increased volume. "We would normally expect higher gross margin from our Renewable segment, but in the short term we continue to recognize revenue from our challenged European renewable contract at zero gross profit margin," said Ferland. "During the third quarter, the net estimated costs to complete the project improved by $1.0 million with site productivity related cost increases more than offset by a probable project related insurance recovery. Ramp down of construction activities on the site is underway, and will continue into early 2017 as we complete key milestones on this project."

253.    The Company also commented on its 2016 Outlook, reducing its revenue guidance and stating, in relevant part:

2016 Outlook

Revenue guidance for 2016 is reduced from $1.8 billion to $1.7 billion due to challenging Industrial and Power markets. The Company reaffirms adjusted EPS guidance of $0.63 to $0.83. Adjusted EPS excludes restructuring activities, acquisition and integration costs, non-cash mark-to-market adjustments for pension and other post-retirement benefits, and spin-off transaction costs. As more fully described in Exhibit 1, Management is unable to reconcile without unreasonable effort the Company's forecasted range of adjusted EPS for the full year to a comparable GAAP range.

***November 2, 2016 Form 10-Q***

254.    On November 2, 2016, the Company filed a Form 10-Q with the SEC for the fiscal quarter ended September 30, 2016 (the "3Q 2016 10-Q"), signed by Defendant Hoehn. The 3Q 2016 10-Q failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial

reporting. Instead, the 3Q 2016 10-Q reiterated substantially the same financial results provided in the 11-2-2016 Press Release.

255.    The 3Q 2016 10-Q disclosed a $14 million charge recorded for the Copenhill project due to "complexities associated with the nature of the remediation, combined with lower than expected labor efficiencies, [which] extended the anticipated schedule."

256.    The Company also "determined it was probable that we would receive 100 million Danish Krones ("DKK") ($15.0 million) insurance recovery for a portion of the losses on this contract, which represents the full amount available under the insurance policy." The Company therefore recognized the insurance recovery as a reduction in costs during the third quarter of 2016. However, the Company increased reserves for losses on the Copenhill contract to $7.8 million, up from $6.4 million held in reserve in the previous quarter.

257.    The 3Q 2016 10-Q stated that the Copenhill project was approximately 79% complete as of September 30, 2016, and the Company "expect[ed] B&W's construction on the project will be completed in early 2017, with remaining commissioning and turnover activities linked to the customer's operation of the facilities through mid-2017.

258.    In a section titled "Bookings and Backlog," the 3Q 2016 10-Q showed a Renewable backlog of $1.289 billion as of September 30, 2016 and stated that the Company expected to recognize revenue from the Renewable backlog of $136 million in 2016, $297 million in 2017, and $856 thereafter.

259.    Attached to the 3Q 2016 10-Q were SOX certifications signed by Defendants Ferland and Apker attesting to its accuracy.

***November 3, 2016 Earnings Conference Call***

260.     The Company held an investor call to discuss its financial results for the quarter ended September 30, 2016. In the earnings conference call, Defendants Ferland and Apker failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting.

261.     During the call, Defendant Ferland stated:

Renewable segment revenues increased 43% for the third quarter 2016 compared to the prior year. Gross profits are up year-over-year due to higher levels of activity in this segment. The challenged project we discussed last quarter had a net benefit of $1 million for the quarter. Lower-than-expected labor productivity caused the project timeline to slip, resulting in a $14 million increase in the estimated cost to complete the project. However, this was offset by a probable project-related insurance recovery of $15 million. We expect key project milestones will complete in early 2017. Ramp down of on-site construction personnel began this month and will continue into the first quarter.

262.     Defendant Ferland also positively described progress on the troubled Renewable project, Copenhill:

That project, and we've mentioned this before, it's relatively complex for us to go back in and retrofit the piping and the steel into what's essentially a complete plan. As a result of that, we did experience lower productivity than we'd

92

anticipated. We had ramped the number down, the productivity number down already in our original estimates. It turns out it was a little bit lower than that and that is the bulk of the $14 million difference. That said, we are making significant progress on that project.

I'll give you a couple of data points. The two major systems that we continue to work on I would classify as piping and electrical, and we are nearing completion on those. For example, in mid-July, piping was about 39% complete. Today, piping is 83% complete. Electrical in mid-July was 40% complete and today it's 78% complete. As I mentioned on the call, we are already beginning the ramp down process of the on-site construction labor, which reduces our run rate. So when you put those together, we continue to see the projects finishing up Q1, early Q1 2017 and our spend rate is dropping already and it will be significantly lower by December/January than it is today. So, we remain confident that the numbers we have out there today are doable, and the variability in those numbers continues to shrink as we near completion on the project.

263.    Defendant Apker stated that: "Excluding the challenged project, our other Renewable projects are progressing as expected."

264.    Regarding Renewables, Defendant Ferland stated, in relevant part:

As the year comes to a close, we'll be focused on completing our challenged Renewable project and broadly improving our project execution consistency, continuing to integrate B&W SPIG, and capitalizing on the synergies from this acquisition, and closing project bookings to ensure we produce stronger results in 2017.

* * *

The Renewable business we continue to see long-term opportunities to grow that business going forward, at least the margins that we've projected.

* * *

So, we continue to push. Again, moving into '17, we have a nice backlog. We have a large number of projects underway and we'll continue to emphasize project execution on that front while we try to bring in the new work, both to bolster '17 as well as to build the backlog for '18 and '19.

265.    Defendant Apker also discussed the impact of the Copenhill project on cash flow from operations, stating:

The 2016 cash flow story is really all about that problem project in Europe, which for full-year 2016, which includes Q3 and Q4, that's going to have a negative

impact of about $75 million to $80 million on our cash flow, in part from the increased costs, which we have to absorb, but primarily due to those milestone payment shifts from 2016 to 2017. So, to the extent we're delayed in achieving project milestones, we can't bill our customer and we can't collect those billings, and those dollars don't come in, in 2016 if this—in our forecast, but we are expecting that they will come in, in 2017. Positively, when we achieve those milestones, we'll bill the cash and we'll collect it in '17, which actually provides a pretty nice tailwind to 2017 free cash flow.

I think Q4 will produce positive cash flow, but because of the story of the problem project, probably not sufficient in Q4 to make the full year positive.

266.    In response to the Company's earnings release and investor call, B&W's share price fell $1.61, or 10.3%, closing at $14.00 on November 3, 2016.

***February 28, 2017 Press Release***

267.    On February 28, 2017, the Company issued a press release announcing financial results for the fiscal quarter and year ended December 31, 2016, and also provided its guidance for the fiscal year 2017 (the "2-28-17 Press Release"). The 2-28-17 Press Release failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting.

268.    The 2-28-17 Press Release noted a $122.7 million decrease in quarterly revenues compared to the fourth quarter of 2015, a loss in GAAP earnings per share for the quarter of $1.47 compared to a loss per share of $0.10 for the fourth quarter of 2015, and a loss of $1.60 adjusted earnings per share for the fourth quarter 2016 compared to adjusted earnings per share of $0.47 in the fourth quarter of 2015. The 2-28-17 Press Release stated, in relevant part:

> Babcock & Wilcox Enterprises, Inc. (B&W) (NYSE:BW) announced today fourth quarter 2016 revenues of $380.0 million, a decrease of $122.7 million, or 24.4%, compared to the fourth quarter of 2015. GAAP earnings per share for the fourth quarter of 2016 were a loss of $1.47 compared to a loss per share of $0.10 for the fourth quarter of 2015. Adjusted earnings per share, which exclude the gain on sale of an equity method investment, non-cash mark-to-market adjustments for pension and other post-retirement benefits, acquisition and integration costs, litigation charges, restructuring activities, and spin-off transaction costs, were a loss of $1.60 for the three months ended December 31, 2016 compared to adjusted earnings per share of $0.47 in the prior year period.
>
> "During our 18 months as an independent company, we have made significant progress realigning the business and executing on our strategic goals. In 2016, we focused on enhancing the profitability of our Power business and increasing revenue diversification by driving the growth of our Industrial and Renewable businesses. Through the restructuring of our Power business, we have created a leaner, more flexible organization that is better positioned to compete in the market. In our Industrial segment, we have made key acquisitions to build the business and grow our B&W-wide non-coal revenue to greater than 50% of our total revenues in 2016," said Mr. E. James Ferland, Chairman and Chief Executive Officer. "Productivity and schedule issues in our Renewable segment, however, significantly impacted our results in the fourth quarter and for the full year. We have taken specific actions to address these issues, and to enhance the resources and infrastructure of the Renewable segment, better enabling it to profitably capture long-term market opportunities. We are confident in our strategy and believe that the Company is well positioned to create long-term value for shareholders."

269.    In the 2-28-2017 Press Release, the Company commented further on the $122.7 million decrease in consolidated revenues for the fourth quarter compared to the fourth quarter of 2015, attributing it primarily to decreased volume in the Power segment and setbacks in Renewable projects. The 2-28-17 Press Release stated, in relevant part:

Results of Operations

Consolidated revenues for the fourth quarter of 2016 were $380.0 million, a decrease of $122.7 million, compared to $502.7 million for the fourth quarter of 2015, due primarily to decreased volume in the Power segment, in line with revised expectations, and setbacks in Renewable projects, partially offset by an increase in revenues in the Industrial segment. The GAAP operating loss for the fourth quarter of 2016 was $58.6 million as compared to an operating loss of $10.0 million in the fourth quarter of 2015. The adjusted operating loss in the fourth quarter of 2016 was $65.0 million, a decrease of $104.5 million compared to adjusted operating income of $39.5 million in the fourth quarter of 2015, due mainly to charges on contracts within our Renewable segment.

270.    The 2-28-2017 Press Release also discussed the Company's Power Segment results, noting a 33.3% decrease to $218.1 million for the fourth quarter of 2016, attributing it to lower activity in retrofits, new build utility and environmental work and industrial steam generation. The 2-28-17 Press Release stated, in relevant part:

Power Segment Results

Fourth quarter 2016 revenues for the Power segment decreased 33.3% to $218.1 million compared to $327.1 million in revenues in the prior year period. Revenues decreased as a result of lower activity in retrofits, new build utility and environmental work and industrial steam generation, which was in line with revised expectations and the proactive restructuring plan. Gross profit in the Power segment in the fourth quarter 2016 was $62.6 million, compared to $71.4 million in the prior year period. As a result of the restructuring as well as good contract performance, gross profit margin improved year over year.

271.    Additionally, the 2-28-17 Press Release commented on the Company's Renewable Segment Results and Liquidity, noting that the former decreased $59.7 million in the fourth quarter of 2016 compared to the fourth quarter of 2015 due to increased costs to complete and lengthened schedule on several contracts. The 2-28-17 Press Release noted, in relevant part:

Renewable Segment Results

Revenues in the Renewable segment were $55.6 million for the fourth quarter of 2016, versus $115.2 million in the corresponding period in 2015, a decrease of $59.7 million driven by the increased costs to complete and lengthened schedule on several contracts. The Renewable segment has grown significantly over the

past two years and resources used to address previously disclosed issues at one project led to productivity and scheduling issues at others. The Company appointed a new management team and is taking actions to address these issues, including investing in enhanced engineering and project management capabilities and infrastructure. The Renewable segment gross loss of $82.6 million in the fourth quarter of 2016 was $103.7 million lower than the $21.1 million gross profit reported in the prior year fourth quarter due to losses on the Renewable contracts.

Liquidity

The Company's cash and cash equivalents balance, net of restricted cash, increased during the fourth quarter to $95.9 million at the end of 2016, which was mainly driven by strong cash flows from operations in the quarter. The outstanding balances under revolving credit facilities totaled $24.0 million as of December 31, 2016. Because of the challenges in the Renewable segment, the Company expects to use a significant amount of cash during 2017. The Company recently amended its credit facility to allow for continued access and capacity to meet liquidity and letter of credit needs.

272.    The 2-28-17 Press Release also discussed the Company's full year 2017 outlook, providing guidance on the Company's expected revenue, adjusted tax rate, and full year adjusted earnings per diluted share, stating, in relevant part:

Full Year 2017 Outlook

Revenue is expected to increase from $1.6 billion in 2016 to $1.8 billion in 2017.

Full year adjusted EPS is expected to be in the range of $0.75 to $0.95. Adjusted EPS excludes intangible asset amortization expense, restructuring expenses, acquisition and integration costs, non-cash mark-to-market adjustments for pension and other post-retirement benefits and spin-off transaction costs. The reduction in the previously discussed EPS guidance range includes approximately $0.60 of impacts from Renewable projects and related interest expense from credit facility usage.

The adjusted tax rate for 2017 is expected to be in the range of 32% to 34%.

As more fully described in Exhibit 1, management is unable to reconcile without unreasonable effort the Company's forecasted range of adjusted EPS for the full year to a comparable GAAP range.

***February 28, 2017 Form 10-K***

273.   On February 28, 2017, the Company filed a Form 10-K with the SEC for the fiscal year ended December 31, 2016 (the "2016 10-K"), signed by Defendants Ferland, Apker, Hoehn, Christopher, Dubin, Ferraioli, Hanks, Pramaggiore, and Weyers. The 2016 10-K reiterated substantially the same financial results provided in the 2-28-17 Press Release. The 2016 10-K failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting.

274.   The 2016 10-K disclosed that three additional Renewable projects had become losses as a result of delays caused by resource constraints related to the original problem project. Specifically, the 2016 10-K reported charges relating to four Renewable projects which had caused losses:

> During 2016, we recorded a total of $141.1 million in losses from changes in the estimated revenues and costs to complete renewable energy contracts in Europe, of which $98.1 million were recorded in the fourth quarter of 2016. These 2016

losses include $35.8 million of anticipated liquidated damages that reduced revenue.

As we disclosed in prior reports, we incurred $30.9 million in charges (net of $15.0 million of a probable insurance recovery) due to changes in the estimated cost to complete a contract during the second and third quarters of 2016 related to one European renewable energy project. Additional changes in the fourth quarter of 2016 resulted in $19.4 million of additional charges on this project, and this project adversely impacted other European renewable energy projects due to the limited pool of internal and external resources available for these projects, such as engineering, procurement and construction resources, which in turn caused us to revise downward our estimates with respect to our other European renewable energy projects, including three other projects that became loss contracts.

As of December 31, 2016, this project is approximately 88% complete. We continue to expect construction activities to be completed and the unit to be operational in early 2017, with remaining commissioning and turnover activities linked to the customer's operation of the facility through mid-2017.

The second project became a loss contract in the fourth quarter of 2016, resulting from a charge of $28.1 million in 2016 ($23.0 million in the fourth quarter). As of December 31, 2016, this second project was approximately 67% complete. We expect this second project to be completed in late-2017.

The third project became a loss contract in the fourth quarter, resulting from $30.1 million of the 2016 charges ($25.2 million in the fourth quarter of 2016). As of December 31, 2016, this third project was approximately 82% complete. We expect this third project to be completed in mid-2017.

The fourth project became a loss contract in the fourth quarter of 2016, resulting from $16.4 million of the 2016 charges ($16.2 million in the fourth quarter). As of December 31, 2016, this fourth project was approximately 61% complete. We expect this fourth project to be completed in 2018.

275.    Nonetheless, the Company made the following representations regarding internal

controls in the 2016 10-K:

B&W's management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended). Our internal control over financial reporting includes, among other things, policies and procedures for conducting business, information systems for processing transactions and an internal audit department. Mechanisms are in place to monitor the effectiveness of our internal control over financial reporting and actions are taken to remediate identified internal control deficiencies. Our procedures for financial reporting include the involvement of senior management, our Audit and Finance Committee and our staff of financial and legal professionals. Our

financial reporting process and associated internal controls were designed to provide reasonable assurance to management and the Board of Directors regarding the reliability of financial reporting and the preparation of our consolidated financial statements for external reporting in accordance with accounting principles generally accepted in the United States of America.

Management, with the participation of our principal executive and financial officers, assessed the effectiveness of our internal control over financial reporting as of December 31, 2016. Management based its assessment on criteria established in Internal Control– Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Because of its inherent limitations, a system of internal control over financial reporting can provide only reasonable assurance as to its effectiveness, and may not prevent or detect misstatements. Further, because of changing conditions, effectiveness of internal control over financial reporting may vary over time. Based on our assessment, management has concluded that B&W's internal control over financial reporting was effective at the reasonable assurance level described above as of December 31, 2016.

276.   In a section titled "Backlog," the Company reported a Renewable backlog of $1.241 billion as of December 31, 2016 and stated that the Company expected to recognize revenue from the Renewable backlog of $348 million in 2017, $191 million in 2018, and $702 thereafter.

277.   Attached to the 2016 10-K were SOX certifications signed by Defendants Ferland and Apker attesting to its accuracy.

### March 1, 2017 Earnings Conference Call

278.   On March 1, 2017, the Company held an earnings conference call regarding the fourth quarter and full year 2016 earnings. In the earnings conference call, Defendants Ferland and Apker failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance

and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting.

279.    During the call, Defendant Ferland blamed reported delays and losses on the Company's failure to expand resources and keep up with the growth of the Renewable business:

> Turning now to the Renewable business. Since the spin-off, we have been focused on growing our revenue and market share in this segment, and have accomplished that much faster than expected. In early 2015 the Renewable business began to book significantly more work and revenues increased from $230 million in 2014 to $349 million in 2016. Due to this growth, our resources and capabilities across the business became stretched. Specifically, our previously disclosed efforts to address matters on a renewable project in northern Europe diverted resources, and despite our mitigation plan, late in the fourth quarter began to impact other projects. As a result, we're experiencing productivity and schedule issues that are impacting our estimated cost to complete these projects. We took charges in the fourth quarter, reducing margins and increasing contingency for these projects. We're committed to completing these projects in line with our revised timelines and budget. We've already made key changes to this business and are working with urgency to address these issues.

> We appointed Jimmy Morgan as the head of the segment in December before we became aware of the extent of the issues and their impact late in the fourth quarter.

> * * *

> We also replaced on-site project managers at three key sites, dedicated significant US talent and leadership to both the engineering and project management groups in Europe, and are investing in enhanced project management processes that will span projects from their inception through bidding and execution.

280.    Defendant Ferland further reported:

So, we have—in addition to the one loss project we had discussed previously, there are three other loss projects, you can see the details quite clearly in the K, and there are approximately four other projects in the UK that we saw margins decrease on, but remain positive.

281.    Defendant Ferland asserted that in Renewable, the Company's "[n]umber one, and the initial focus, is keeping up our engineering processes in-depth and improving our overall project management. That will help us not only execute the projects we have but bid projects more accurately in the future."

282.    Defendant Ferland also seemed to backtrack on his earlier statements about the Company's expertise in piping design work, which he had described as a "core competency." On the earnings all, he stated that, going forward, "we're going to emphasize the piece of the power plant that we're really good at, which is the boiler and the grate." He noted that the Company would "perhaps find someone that does the piping and electrical every day. That might be a better model for us going forward, and we'll be looking to make that shift between now and late summer when we bid projects again."

283.    However, despite these disclosures, the Company continued to make false and misleading statements on the earnings call, including:

Defendant Ferland: "We anticipate the revenue impact of this pause on bidding to slow but not significantly impair revenue growth in this segment over the medium term."

Defendant Ferland: "this business has significant upside and the more we focus on our core boiler and great technology going forward, the better we will be able to deliver consistent growth and bottom line value."

Defendant Apker: "We expect 2017 revenues will grow to be approximately $1.8 billion. This reflects stability in Power and Renewable revenues and growth in our Industrial segment. Going into 2017, our company-wide pipeline of opportunities stands at approximately $2.9 billion. We are confident that there are sufficient opportunities in our backlog and our pipeline to support our revenue projections."

284.     Regarding the Company's reassessment of costs and schedules at all Renewable projects in Denmark and the U.K., Defendant Ferland stated:

> We took a lot of time in January and February to dig into each of these projects and ensure we have the right cost to complete and, probably more importantly, we have enough contingency on those projects to give us comfort that we can make it through the rest of 2017, which is when we expect the bulk of these projects to complete or be near completion.

285.     In response to an analyst question regarding whether the Company had "looked at everything else" in Renewables, and "solved the problem, this should not occur going forward," and whether the issue would impact existing projects or bidding on new Renewable projects, Defendant Ferland responded:

> That ties back to the reason we've put a pause on bidding new projects for the first six months of 2017. So a handful of projects, at least one, if not more, that we had the potential to book either late 2016 or early 2017, that we chose not to bid. The reason being, bidding takes engineering resources, and the very first phase of each one of these projects, right after we win it, is heavy on the engineering front. We made the decision to keep our engineering resources focused and deployed on the existing projects, not distract them with either new bids or a new ramp-up on new work. We anticipate by mid to late summer we'll be through enough of the engineering on the other projects that we'll be in a position to reinstitute bidding going forward.

286.     On this news, the price per share of B&W stock fell $6.17, or over 37.3%, from the previous day's closing price to close at $10.33 on March 1, 2017, erasing approximately $300 million in market capitalization in a single day.

### *March 28, 2017 Proxy Statement*

287.     On March 28, 2017, the Company filed the 2017 Proxy Statement, which failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's

costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting. Instead, the 2017 Proxy Statement touted the Company's outstanding performance in 2016, stating, in relevant part:

> We have made measurable progress on our three-pronged strategy. This strategy provides a critical path forward to delivering long-term stockholder value by allowing us to better serve our traditional power customers, enhance our industrial market presence and increase our non-coal revenue base.

> The past year, our first as an independent company, has been one of opportunity, progress and challenge. We made significant advancement realigning the business and on making the necessary changes in order to best position our operations for the future. Specifically, we focused on enhancing the profitability of our Power business and increasing revenue diversification by driving the growth of our Industrial and Renewable businesses. While some businesses were impacted by market volatility and certain execution issues, we believe our businesses have significant opportunities for growth and are confident that we are well positioned to create long-term value for stockholders.

288. However, the Company admitted that in 2016:

> we faced challenging market conditions, particularly in our legacy coal-based business and also experienced operational challenges in our Renewable segment as we executed on the rapid growth in contracts from the past 12 months. These had a significant impact on our 2016 financial results.

289. The 2017 Proxy Statement asserted that in response to those challenges:

> The Board has worked closely with the management team and has overseen

specific actions to address these execution issues, and enhance the resources and infrastructure of the Renewable segment, enabling it to capture its significant market opportunities. We are focusing primarily on project management and engineering process improvements so that we have the right systems and resources in place to improve our performance and allow us to continue to grow this important segment of our Company.

290.    Additionally, the 2017 Proxy Statement noted, "We have continued to be guided by strong corporate governance practices that demonstrate our commitment to ethical values, to strong and effective operations and to achieving growth and financial stability for our stockholders." The 2017 Proxy Statement further noted its "corporate governance policies and structures . . . help us operate more effectively, mitigate risk and act as a safeguard against mismanagement." These statements were specifically false and misleading due to the omissions referenced herein and the Individual Defendants' failures to abide by the requirements of the Code of Ethics and Code of Conduct, which were also referenced in the 2017 Proxy Statement.

### *May 9, 2017 Press Release*

291.    On May 9, 2017, the Company issued a press release announcing financial results for the fiscal quarter and year ended March 31, 2017, (the "5-9-17 Press Release"). The release reported first quarter revenues of $391.1 million, a decrease of $13.0 million, or 3.2% compared to the first quarter of 2016, and adjusted EPS of $0.04 for the three months ended March 31, 2017, compared to adjusted EPS of $0.29 in the first quarter of 2016. The 5-9-17 press release failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased

profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting.

292.    Defendant Ferland stated the following regarding the results.

> Our Renewable segment project portfolio is performing within the revised cost and schedule forecast we provided earlier in the year . . . We remain committed to our longer-term strategy of optimizing the Power business, broadening the Renewable segment's global footprint under an improved business model, and growing the Industrial segment. Our transformation into a more diversified engineered solutions company is on track, and while our focus is on project execution and integration in the near-term, we look forward to pursuing additional value-added acquisitions in 2018, focusing on industrial companies with good technology and synergy potential, thereby driving value for both our customers and our shareholders.

### *May 9, 2017 Form 10-Q*

293.    On May 9, 2017 the Company filed a Form 10-Q with the SEC for the fiscal quarter ended March 31, 2017 (the "1Q 2017 10-Q"), signed by Defendant Hoehn. The 1Q 2017 10-Q failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key

projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting.

294.    The 1Q 2017 10-Q contained a section titled "Bookings and backlog," which reported Renewable bookings of $36 million for the three months ended March 31, 2017. It further listed a Renewable backlog of $1.171 billion as of March 31, 2017, and stated that the Company expected to recognize revenue from the Renewable backlog of $283 million in 2017, $189 million in 2018, and $699 thereafter.

295.    The 1Q 2017 10-Q further stated that the Company's management had evaluated the design and operation of the Company's disclosure controls and procedures, and that Defendants Ferland and Apker had concluded

> that the design and operation of our disclosure controls and procedures are effective as of March 31, 2017 to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission, and such information is accumulated and communicated to management as appropriate to allow timely decisions regarding disclosure.

296.    Attached to the 2016 10-K were SOX certifications signed by Defendants Ferland and Apker attesting to its accuracy.

### May 10, 2017 Earnings Conference Call

297.    On May 10, 2017, the Company hosted an earnings conference call regarding the financial results for the quarter ended March 31, 2017.   In the earnings conference call, Defendants Ferland and Apker failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in

engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting.

298.    On the call, Defendant Ferland continued to tout alleged improvements in the Renewable segment, stating:

> In the Renewables segment, we're working to position the business for the future and are making progress toward the completion of our projects currently in our portfolio. On a net basis, project costs across our Renewable portfolio were in line with the updated estimated cost to complete we provided in the fourth quarter results.
> In the quarter we continued to improve our project management leadership and internal review processes across our Renewable business. We are intently focused on execution. With respect to the segment's two large non-U.K. projects, construction on the first is essentially complete and the other project is well into commissioning. Both of these projects are expected to be turned over to the respective customers in the second half of 2017. As the projects reach completion, we will continue to transition our resources to the other projects in our portfolio.

> \* \* \*

> In Renewable, our focus in the near term is on execution. In the medium to long term, we continue to see a strong market for our highly reliable and flexible waste-to-energy technology.

> \* \* \*

Looking at 2017 and beyond, B&W is well positioned to deliver shareholder value . . . For the remainder of 2017, we're focused on project execution and on the integration of our recent acquisitions. In the coming months we look forward to re-entering the European renewable marketplace with a strengthened business model.

299.     Defendant Apker also harped on the Company's renewed focus on execution in the Renewable segment and cost control throughout the Company, stating, in relevant part:

[T]he quarter benefited from the timing of work moving into Q1, mostly in Power, and good cost control throughout the organization.

Renewable segment revenues were $106 million, up from $84 million in the prior year quarter. As expected, gross profit decreased due to the previously disclosed changes in estimated cost to complete on multiple contracts. As Jim discussed, contract performance was largely in line with our expectations during the quarter and we continue to expect the segment to generate low double-digit gross margins for the full year 2017.

**The Truth Fully Emerges**

300.     The full truth about the issues, delays, and additional charges plaguing the Renewable segment and its effect on the Company's overall financial performance was not revealed until August 9, 2017 when the Company disclosed its financial results for the quarter ended June 30, 2017.

*August 9, 2017 Press Release*

301.     On August 9, 2017, the Company issued a press release announcing financial results for the fiscal quarter and year ended June 30, 2017, (the "8-9-17 Press Release"). The Release announced additional cost overruns on six Renewable projects, which negatively impacted the Company's overall financial results and necessitated additional financing. The release reported second quarter 2017 revenues of $349.8 million, a decrease of $33.4 million, or 8.7% compared to the second quarter of 2016. The Company further reported an adjusted operating loss of $119 million, or $2.56 per share for the three months ended June 30, 2017, compared to adjusted loss per share of $0.18 in the second quarter of 2016.

302.   This poor performance was driven by $115 million in charges in the Renewable segment for the second quarter of 2017. Defendant Ferland explained the results as follows:

Our second quarter financial results reflect a $115.2 million charge arising from unexpected cost and schedule issues in the Renewable segment . . . We have revamped our go-forward business model for this segment and have also entered into new financing arrangements. These arrangements provide us the financial flexibility to focus on completing our U.K. Renewable projects while executing our three prong business strategy to optimize our Power business, pursue profitable growth under our new execution model in Renewable, and grow our Industrial segment.

As we advanced engineering, and re-estimated overall productivity levels on six new-build projects in the Renewable segment, late in the quarter we concluded we would not hit our cost and schedule targets . . . We are diligently working with all parties involved to complete these projects within the revised time lines.

*  *  *

Going forward, under a revised business model, we will focus on our core technologies with balance of plant and civil construction scope being executed by a partner

303.   The Company further reported:

Revenues in the Renewable segment were $48.1 million for the second quarter of 2017, versus $85.5 million in the corresponding period in 2016, a decrease of $37.4 million. The Renewable segment gross loss was $110.9 million in second quarter 2017, compared to a gross loss of $17.5 million reported in second quarter 2016, due to the recognition of a $115.2 million, or $2.36 per share, charge for increased estimated costs to complete six projects in backlog, as the result of lower-than-forecasted productivity and schedule delays.

304.   With respect to revising its 2017 Outlook, the Company noted:

Renewable: full year 2017 revenue of approximately $350 million with positive gross margins returning in second half 2017.

305.   The 8-9-17 Press Release further disclosed that on August 9, 2017, the Company had entered into a loan agreement with Lightship, which required that the Company purchase all of Lightship's approximately 10% equity interest in the Company effective that day.  The 8-9-17 Press Release stated, in pertinent part:

On August 9, 2017, the Company entered into a second-lien term loan agreement with Lightship Capital LLC, an affiliate of American Industrial Partners, and amended

the terms under its existing revolving credit facility. Under the second-lien term loan, which matures on December 30, 2020, the Company borrowed $176 million. The second-lien term loan also provides for an additional $20 million of borrowing capacity subject to conditions in the agreement.

The Company will use the proceeds to reduce borrowings under its existing revolving credit facilities, and as a condition of the second-lien loan agreement, it will repurchase Lightship Capital's 4.8 million share equity stake in the Company. The purchase of these shares will reduce the Company's shares outstanding correspondingly.

### *August 9, 2017 Earnings Call*

306.    The Company hosted an earnings conference call on August 9, 2017. During the

call Defendant Ferland expounded on the charges and changes in the Renewable segment:

In the quarter, we recorded $115 million charge for increases in estimated cost to complete projects in our backlog, the large majority of which related to 4 construction projects in the U.K. The main items behind the estimated cost increases are higher quantities and lower overall productivity levels, which led to lengthened schedules, higher cost and increased reserves for liquidated damages. We've also recognized the need to include additional float related to potential variations in the project schedules and now to identify project risks in our revised forecast. Specific to the 4 ongoing projects in the U.K., these estimates represent 20% of estimated remaining spend compared to 14% at the end of the first quarter.

* * *

During the second quarter, we completed our review of potential new business models and also a review of the broader renewable waste energy and biomass markets. We concluded that there is demand for our proprietary and reliable boiler, grate and environmental equipment technologies. Going forward, however, our business model will change. We will focus primarily on our core technologies with the balance of plant and civil construction scope being executed by a partner. Although this execution model reduces our addressable market opportunity from a revenue per project standpoint, it carries lower execution risk and better profitability potential and is more consistent with our company-wide strategy of being an industrial equipment technology and solutions provider. We have completed extensive analysis of potential partners, and we plan to return to bidding renewable projects in Europe under our new execution model in the second half of 2017. Profitability and risk management will be key moving forward.

* * *

So the revenue per project piece is pretty straightforward. We expect -- in the past, we've told folks that the average Renewable projects, we would expect roughly $100 million in revenue for B&W. Under the new business model, we'd expect it to be about half of that per project. So we'll be focusing going forward only on our core technology, boiler,

grate, perhaps environmental controls and ash. And we'll be leaving the balance of plant portion to our partners in the future. So on a per project basis, about half.

307.     Defendant Apker further explained that the loan from Lightship and the changes to an existing revolving credit facility were needed "[a]s a result of the additional charges in the Renewable segment[.]"

***August 9, 2017 Form 10-Q***

308.     On August 9, 2017 the Company filed a Form 10-Q with the SEC for the fiscal quarter ended June 30, 2017 (the "2Q 2017 10-Q"), signed by Defendant Hoehn.

309.     The 2Q 2017 10-Q reported the following charges related to six Renewable projects that were operating as loss contracts:

> During the three months ended June 30, 2017, two additional renewable energy projects in Europe became loss contracts. During the three and six months ended June 30, 2017, we recorded a total of $115.2 million and $112.2 million, respectively, in net losses resulting from changes in the estimated revenues and costs to complete these six European renewable energy loss contracts . . . The charges recorded in the second quarter of 2017 are . . . primarily as a result of scheduling delays and shortcomings in our subcontractors' estimated productivity. Also included in the charges recorded in the second quarter of 2017 were corrections to estimated contract costs at completion of $4.9 million and $6.2 million relating to the three months ended December 31, 2016 and March 31, 2017, respectively. Management has determined these amounts are immaterial to the consolidated financial statements in both previous periods.

310.     The 2Q 2017 10-Q also disclosed a material weakness in the Company's internal controls over financial reporting at B&W Volund, which had not been fully remediated at the time of filing. Specifically, the 2Q 2017 10-Q stated:

> As of March 31, 2017, we did not maintain effective internal control over the completeness and accuracy of the information used in the percentage of completion ("POC") accounting for three European renewable energy projects at Vølund, a business unit within our Renewable segment. Based on our detailed investigation, we determined Vølund's project accountants and project management did not timely identify certain subcontractor costs and required quantities of certain labor and equipment needed to complete ongoing projects, which resulted in an understatement of our consolidated net loss in the first quarter of 2017. Though the error was not material, the related internal control deficiency was considered a material weakness because it could have resulted in material errors in our financial statements. The correction of the immaterial error was

included in the $115.2 million charge we recognized for changes in POC accounting estimates recorded in our statement of operations in the second quarter of 2017. Factors that contributed to the material weakness in internal control over financial reporting during the first quarter of 2017 were turnover of key project and supply chain personnel at Vølund and the relocation of certain project management responsibilities from Vølund's administrative offices to the project sites during a period of significant changes in subcontractors' scopes of work. As a result, our processes and internal controls associated with the completeness and accuracy of information used to estimate revenue and related costs in the application of POC accounting for these three projects were ineffective.

\* \* \*

*Remediation of the material weakness in internal control over financial reporting*

As of June 30, 2017, we have not yet fully remediated the material weakness at Vølund. With the oversight of our senior management and the Audit and Finance Committee of our Board of Directors, we have taken and will continue to take steps intended to address and remediate the underlying causes of the material weakness in internal control over financial reporting at Vølund.

311.    Attached to the 2Q 2017 10-Q were SOX certifications signed by Defendants Ferland and Apker attesting to its accuracy.

312.    On this news, the Company's share price fell more than 72%, falling from a closing price of $9.75 on August 9, 2017 to close at $2.70 on August 10, 2017.

313.    The Individual Defendants breached their fiduciary duties by making and/or causing the Company to make the foregoing material misrepresentations and omissions. Additionally, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting. Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced, rendering them personally liable to the Company for breaching their fiduciary duties.

**Repurchases**

314.    After the 8-9-17 Press Release was issued and the 2Q 2017 10-Q was filed on August 9, 2017, the price per share of B&W stock fell to a closing price of $1.69 on August 23, 2017. This price reflected the true price per share of B&W stock, had the Individual Defendants not engaged in their schemes as outlined herein. Therefore, any repurchases by the Company should have been made valuing their common stock at $1.69. In breach of their fiduciary duties, the Individual Defendants caused the Company to make the following repurchases of its own stock at artificially inflated prices.

315.    For the three months ended September 30, 2015, the Individual Defendants caused the Company to repurchase 75,401 shares of its own common stock at an average price per share of approximately $18.06, for a total cost to the Company of approximately $1.36 million.

316.    Due to the artificial inflation of the Company's stock price caused by the misrepresentations alleged to have been made during the Relevant Period, the Company paid on average $16.37 more than each such share was worth during the three months ended September 30, 2015.

317.    Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended September 30, 2015 was approximately $1.2 million.

318.    For the three months ended December 31, 2015, the Individual Defendants caused the Company to repurchase 1,249,817 shares of its own common stock at an average price per share of approximately $18.41, for a total cost to the Company of approximately $23.0 million.

319.    Due to the artificial inflation of the Company's stock price caused by the misrepresentations alleged to have been made during the Relevant Period, the Company paid on

average $16.72 more than each such share was worth during the three months ended December 31, 2015.

320.    Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended December 31, 2015 was approximately $20.9 million.

321.    For the three months ended March 31, 2016, the Individual Defendants caused the Company to repurchase 1,836,929 shares of its own common stock at an average price per share of approximately $19.78, for a total cost to the Company of approximately $36.3 million.

322.    Due to the artificial inflation of the Company's stock price caused by the misrepresentations alleged to have been made during the Relevant Period, the Company paid on average $18.09 more than each such share was worth during the three months ended March 31, 2016.

323.    Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended March 31, 2016 was approximately $33.2 million.

324.    For the three months ended June 30, 2016, the Individual Defendants caused the Company to repurchase 766,247 shares of its own common stock at an average price per share of approximately $21.31, for a total cost to the Company of approximately $16.3 million.

325.    Due to the artificial inflation of the Company's stock price caused by the misrepresentations alleged to have been made during the Relevant Period, the Company paid on average $19.62 more than each such share was worth during the three months ended June 30, 2016.

326.    Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended June 30, 2016 was approximately $15 million.

327.    For the three months ended September 30, 2016, the Individual Defendants caused the Company to repurchase 1,616,469 shares of its own common stock at an average price per share of approximately $16.16, for a total cost to the Company of approximately $26.1 million.

328.    Due to the artificial inflation of the Company's stock price caused by the misrepresentations alleged to have been made during the Relevant Period, the Company paid on average $14.47 more than each such share was worth during the three months ended September 30, 2016.

329.    Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended September 30, 2016 was approximately $23.4 million.

330.    For the three months ended December 31, 2016, the Individual Defendants caused the Company to repurchase 1,201 shares of its own common stock at an average price per share of approximately $15.41, for a total cost to the Company of approximately $18,509.

331.    Due to the artificial inflation of the Company's stock price caused by the misrepresentations alleged to have been made during the Relevant Period, the Company paid on average $13.72 more than each such share was worth during the three months ended December 31, 2016.

332.    Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended December 31, 2016 was approximately $16,478.

333.    For the three months ended March 31, 2017, the Individual Defendants caused the Company to repurchase 79,840 shares of its own common stock at an undisclosed price.

334.    For the three months ended June 30, 2017, the Individual Defendants caused the Company to repurchase 2,685 shares of its own common stock at an undisclosed price.

335.    For the month ended July 31, 2017, the Individual Defendants caused the Company to repurchase 3,620 shares of its own common stock at an undisclosed price.

336.    On August 9, 2017, the Individual Defendants caused the Company to repurchase 4,835,775 shares of its own common stock at an average price per share of $10.52, for a total cost to the Company of approximately $50.9 million pursuant to a loan agreement with Lightship Capital LLC.

337.    Due to the artificial inflation of the Company's stock price caused by the misrepresentations alleged to have been made during the Relevant Period, the Company paid on average $8.83 more than each such share was worth on August 9, 2017.

338.    Thus, the total over payment by the Company for its repurchases of its own stock during on August 9, 2017 was approximately $42.7 million.

339.    Thus, in total, during the Relevant Period and before the truth fully emerged, the Company overpaid for repurchases of its own stock by over $135 million.

## DAMAGES TO B&W

340.    As a direct and proximate result of the Individual Defendants' conduct, B&W will lose and expend many millions of dollars.

341.    Such losses include over $135 million the Company overpaid when it repurchased its own common stock during the Relevant Period at artificially inflated prices.

342.    Such expenditures include, but are not limited to, legal fees and payments associated with the Securities Class Action filed against the Company, its Chairman and CEO, and its CFO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

343.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

344.    As a direct and proximate result of the Individual Defendants' conduct, B&W has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment, and that will negatively impact their business and cost of financing.

## DERIVATIVE ALLEGATIONS

345.    Plaintiff brings this action derivatively and for the benefit of B&W to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of B&W, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violation of the federal securities laws, as well as the aiding and abetting thereof.

346.    B&W is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

347.    Plaintiff is, and has continuously been since he purchased stock during the beginning of the Relevant Period, a shareholder of B&W. Plaintiff will adequately and fairly represent the interests of B&W in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

348.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

349.    A pre-suit demand on the Board of B&W is futile and, therefore, excused. At the time of filing of this action, the Board consists of eleven directors (the "Directors"). Eight of the Directors are the following Individual Defendants: Defendants Ferland, Christopher, Dubin, Ferraioli, Hanks, Kass, Pramaggiore, and Weyers (collectively, the "Director Defendants"). Three of the Directors are the following non-parties: Matthew E. Avril, Henry E. Bartoli, Brian R. Kahn.. Plaintiff needs only to allege demand futility as to six of the eleven directors that were on the Board at the time this action was commenced.

350.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they simultaneously caused the Company to repurchase its own stock at artificially inflated prices, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

351.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. While investors were duped into believing the fraud perpetrated by the Individual Defendants, the Company repurchased its own stock at artificially inflated prices. As a result of the foregoing, the Director

Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

352.    Additional reasons that demand on Defendant Ferland is futile follow. Defendant Ferland served as the Company's Chairman since the Spin-off, and as CEO from the time of the Spin-off until January 31, 2018. Thus, as the Company admits in the 2016 and 2017 Proxy Statements, Defendant Ferland has been a non-independent director. Moreover, Defendant Ferland is a defendant in the Securities Class Action. He received lavish compensation, including $5,685,319 in 2016. Defendant Ferland was ultimately responsible for all of the false and misleading statements and omissions alleged herein, many of which he personally made. His large Company stock holding, worth approximately $10.1 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also conducted little, if any, oversight of the artificial inflation of the Company's stock price which resulted in the Company over paying more than $135 million total during the Relevant Period for repurchases of its own common stock. For these reasons, too, Defendant Ferland breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

353.    Additional reasons that demand on Defendant Kass is futile follow. Defendant Kass has served as the Company's CEO and as one of its directors since January 31, 2018. Prior to becoming CEO, Defendant Kass held a number of executive roles in the Company since the

time of the Spin-off, including serving as Vice President, Investor Relations and Communications at the time of the June 17, 2015 Analyst/Investor Day presentation. Thus, Director Defendant Kass is a non-independent director. Director Defendant Kass faces a substantial likelihood of liability for the false and misleading statements alleged herein, including, specifically, those made at the June 17, 2015 Analyst/Investor Day presentation which she claims to have "executed." She receives lavish compensation, including a base salary of $750,000, a target bonus of 100% of base salary, and equity awards including $1.5 million to be granted in February 2018. As an executive officer and as a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. She also conducted little, if any, oversight of the artificial inflation of the Company's stock price, which resulted in the Company over paying more than $135 million total during the Relevant Period for repurchases of its own common stock. For these reasons, too, Director Defendant Kass breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

354. Additional reasons that demand on Director Defendant Christopher is futile follow. Director Defendant Christopher has served as a Company director since 2015 and is a member of the Governance Committee and a member of the Compensation Committee. He received lavish compensation, including $182,368 in 2016. His large Company stock holding, worth approximately $39,219 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a Company director since the first year of B&W's formation, and as a member of the Governance Committee and as a member of the

Compensation Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements (he signed the 2015 & 2016 10-Ks), consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also conducted little, if any, oversight of the artificial inflation of the Company's stock price which resulted in the Company over paying more than $135 million total during the Relevant Period for repurchases of its own common stock. Thus, for these reasons, too, Director Defendant Christopher breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

355.    Additional reasons that demand on Director Defendant Dubin is futile follow. Director Defendant Dubin has served as a Company director since 2015 and is a member of the Audit and Finance Committee and a member of the Governance Committee. She received lavish compensation, including $193,303 in 2016. Her large Company stock holding, worth approximately $120,660 before the fraud was exposed, reveals her interest in keeping the Company's stock price as high as possible. As a Company director since the first year of B&W's formation, and as a member of the Audit and Finance Committee and as a member of the Governance Committee, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements (she signed the 2015 & 2016 10-Ks), consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. She also conducted little, if any, oversight of the artificial inflation of the Company's stock price which resulted in the Company over paying more than $135 million total during the Relevant Period for repurchases of its own common stock. Thus, for these reasons, too, Director Defendant Dubin

breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

356.   Additional reasons that demand on Director Defendant Ferraioli is futile follow. Director Defendant Ferraioli has served as a Company director since 2015 and is Chairman of the Audit and Finance Committee and a member of the Governance Committee. He received lavish compensation, including $198,293 in 2016. His large Company stock holding, worth approximately $35,917 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a Company director since the first year of B&W's formation, and Chairman of the Audit and Finance Committee and member of the Governance Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements (he signed the 2015 & 2016 10-Ks), consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also conducted little, if any, oversight of the artificial inflation of the Company's stock price which resulted in the Company over paying more than $135 million total during the Relevant Period for repurchases of its own common stock. Thus, for these reasons, too, Director Defendant Ferraioli breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

357.   Additional reasons that demand on Director Defendant Hanks is futile follow. Director Defendant Hanks has served as a Company director since 2015 and is Lead Independent Director, Chairman of the Governance Committee, and a member of the Compensation Committee. He received lavish compensation, including $214,271 in 2016. His large Company stock holding, worth approximately $248,904 before the fraud was exposed, reveals his interest

in keeping the Company's stock price as high as possible. As a Company director since the first year of B&W's formation, Lead Independent Director, Chairman of the Governance Committee, and member of the Compensation Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements (he signed the 2015 & 2016 10-Ks), consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also conducted little, if any, oversight of the artificial inflation of the Company's stock price which resulted in the Company over paying more than $135 million total during the Relevant Period for repurchases of its own common stock. Thus, for these reasons, too, Director Defendant Hanks breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

358.    Additional reasons that demand on Director Defendant Pramaggiore is futile follow. Director Defendant Pramaggiore has served as a Company director since 2015 and is a member of the Audit and Finance Committee and a member of the Compensation Committee. She received lavish compensation, including $179,980 in 2016. Her large Company stock holding, worth approximately $261,550 before the fraud was exposed, reveals her interest in keeping the Company's stock price as high as possible. As a Company director since the first year of B&W's formation, and member of the Audit and Finance Committee and member of the Compensation Committee, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements (she signed the 2015 & 2016 10-Ks), consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. She also conducted little, if any, oversight of the artificial inflation of the Company's stock price which

resulted in the Company over paying more than $135 million total during the Relevant Period for repurchases of its own common stock. Moreover, Director Defendant Pramaggiore is currently an officer of an entity with which the Company has transacted business with. She may fear retaliation if she accepts Plaintiff's demand. Thus, for these reasons, too, Director Defendant Pramaggiore breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

359.    Additional reasons that demand on Director Defendant Weyers is futile follow. Director Defendant Weyers has served as a Company director since 2015 and is Chairman of the Compensation Committee and a member of the Audit and Finance Committee. He received lavish compensation, including $196,601 in 2016. His large Company stock holding, worth approximately $216,788 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a Company director since the first year of B&W's formation, Chairman of the Compensation Committee, and member of the Audit and Finance Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements (he signed the 2015 & 2016 10-Ks), consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also conducted little, if any, oversight of the artificial inflation of the Company's stock price which resulted in the Company over paying more than $135 million total during the Relevant Period for repurchases of its own common stock. Thus, for these reasons, too, Director Defendant Weyers breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

360.    Additional reasons that demand on the Board is futile follow.

361.    The Directors have longstanding business, personal, and familiar relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

362.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the federal securities laws. In violation of the Code of Conduct, the Director Defendants failed to "comply with laws and regulations," and maintain the "integrity of records and accounting procedures" and the employee responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

363.    Additionally, the demand in this case is excused as to Defendant Ferland because he violated the Code of Ethics. In violation of the Code of Ethics, Defendants Ferland, as an executive of the Company, conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of

the federal securities laws. In violation of the Code of Ethics, Defendant Ferland failed to make "full and fair disclosures" and "comply with laws and regulations." Thus, Defendant Ferland faces a substantial likelihood of liability and demand is futile as to him.

364.    B&W has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for B&W any part of the damages B&W suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

365.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

366.    The acts complained of herein constitute violations of fiduciary duties owed by B&W's officers and directors, and these acts are incapable of ratification.

367.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of B&W. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that

eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of B&W, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

368.    If there is no directors' and officers' liability insurance, then the Directors will not cause B&W to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

369.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

370.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

371.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding B&W. Not only is B&W now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon B&W by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to

repurchase tens of millions of dollars of its own shares on the open market at artificially-inflated prices, damaging B&W by tens of millions of dollars.

372.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

373.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about B&W not misleading.

374.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by B&W.

375.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false

and misleading statements and omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

376.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director would have signed the Company's false and misleading Form 10-K's filed with the SEC during the Relevant Period.

377.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

378.    Plaintiff on behalf of B&W has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 20(a)
### of the Securities Exchange Act of 1934

379.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

380.    The Individual Defendants, by virtue of their positions with B&W and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of B&W within the meaning of §20(a) of the Exchange Act.  The Individual Defendants had the power and influence and exercised the same to cause B&W to engage in the illegal conduct and practices complained of herein.

## THIRD CLAIM

### Against Individual Defendants for Violations of
### Section 14(A) of the Securities Exchange Act of 1934

381.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

382.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

383.     Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

384.     Under the direction and watch of the Directors, the 2016 Proxy Statement and 2017 Proxy Statement failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the

foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting.

385.   Moreover, the 2016 Proxy Statement and 2017 Proxy Statement made false and misleading statements and omissions when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Ethics and Code of Conduct, due to the Individual Defendants' failures to abide by them.

386.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2016 Proxy Statement and 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2016 Proxy Statement and 2017 Proxy Statement, including but not limited to, election of directors, approval of officer compensation, and appointment of an independent auditor.

387.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2016 Proxy Statement and 2017 Proxy Statement.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

388.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

389.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of B&W's business and affairs.

390.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

391.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of B&W.

392.    In breach of their fiduciary duties owed to B&W, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose: (1) issues with B&W's Renewable Segment Business, including schedule and productivity issues for projects, a lack of resources in engineering and project management groups, and problematic on-site project management, resulting in engineering errors, project delays, and overly aggressive project bidding; (2) the effect such issues were having on B&W's costs to complete projects, which resulted in declining financial performance and decreased profit margins, and thus negatively impacted B&W's financials and the Company's ability to meet its guidance; (3) B&W lacked adequate project management processes in its Renewable Segment Business, negatively impacting B&W's performance on key projects from the bidding stage through execution; (4) B&W understated its costs to complete and loss contingencies on its Renewable Segment Business projects; (5) that, as a result of the foregoing, the Company's presentation of its business, operations, and prospects were misleadingly positive; and (6) the Company lacked effective internal controls over financial reporting. The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

393.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

394.    In further breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company during the Relevant Period to repurchase its own common stock at artificially inflated prices, such that it overpaid by more than $135 million.

395.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of B&W's securities.

396.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of B&W's securities.

397.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

398.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, B&W has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

399.     Plaintiff on behalf of B&W has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

400.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

401.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, B&W.

402.     The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from B&W that was tied to the performance or artificially inflated valuation of B&W, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

403.     Plaintiff, as a shareholder and a representative of B&W, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

404.     Plaintiff on behalf of B&W has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

405.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

406.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence B&W, for which they are legally responsible.

407.    As a direct and proximate result of the Individual Defendants' abuse of control, B&W has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, B&W has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

408.    Plaintiff on behalf of B&W has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

409.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

410.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of B&W in a manner consistent with the operations of a publicly-held corporation.

411.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, B&W has sustained and will continue to sustain significant damages.

412.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

413.    Plaintiff, on behalf of B&W, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

414.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

415.    The Individual Defendants caused the Company to purchase its own stock at artificially inflated prices and to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

416.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused B&W to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

417.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

418.    Plaintiff on behalf of B&W has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of B&W, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and

abetted the breach of their fiduciary duties to B&W;

(c)     Determining and awarding to B&W the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing B&W and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect B&W and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of B&W to nominate at least six candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding B&W restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: February 16, 2018

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Tel: (516) 922-5427
Fax: (516) 344-6204
tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff Mike DeAngelis*